UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Frank J. Steinhauser, III;
Mark E. Meysembourg; and
Kelly G. Brisson,

                          Plaintiffs,

vs.

Randy Kelly individually and as Mayor of                )
City of St. Paul; Andy Dawkins individually             )
and as Director of City of St. Paul's Department        )
of Neighborhood Housing and Property                    )
Improvement; Lisa Martin individually and as            )
a code enforcement officer of City of St.               )
Paul's Department of Neighborhood Housing               )
and Property Improvement; Steve Magner                  )
individually and as a supervisor of City of St.         )
Paul's Department of Neighborhood Housing               )
and Property Improvement; Dean Koehnen                  )
individually and as a law enforcement officer of        )
City of St. Paul; John Doe and Jane Doe,                )
individually and in their official capacities as        )
code enforcement officers of City of St. Paul's         )
Department of Neighborhood Housing and                  )
Property Improvement, law enforcement                   )
officers or other officials or employees of the         )
City of St. Paul; individually, jointly and severally;  )
and City of St. Paul, a municipal corporation,          )
                                                        )
                          Defendants.                   )
                                                        )

**CORRECTED**
**FIRST AMENDED**
**COMPLAINT**

Court File No. 04-2632 (JNE/SRN)

**DEMAND FOR JURY TRIAL**

Frank J. Steinhauser, III, Mark E. Meysembourg and Kelly G. Brisson (hereinafter referred to as

1

"Steinhauser," "Meysembourg" and "Brisson" and collectively referred to as "Plaintiffs"), hereby allege and state the following Amended Complaint against Randy Kelly, individually and as the Mayor of the City of St. Paul; Andy Dawkins, individually and as the Director of the City of St. Paul's Department of Neighborhood Housing and Property Improvement (hereinafter "Housing Department"); Lisa Martin, individually and as a code enforcement officer of the Housing Department; Steve Magner, individually and as a supervisor of the Housing Department; Dean Koehnen, individually and as a law enforcement officer of the City of St. Paul; and John Doe and Jane Doe, individually and in their official capacities as code enforcement officers of the Housing Department, law enforcement officers, other officials or employees of the City of St. Paul; individually, jointly and severally; and the City of St. Paul, a municipal corporation.

## JURISDICTION

This civil action arises under the laws of the United States and the State of Minnesota. This Court has jurisdiction and Plaintiffs herein are alleging standing under:

(1)     Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. Sections 1961, et seq.;

(2)     Title VIII, the Fair Housing Act of 1968 and the Fair Housing Amendments Act of 1988, 42 U.S.C. Sections 3601, et seq.;

(3)     42 U.S.C. Sections 1981, 1982 and 1985; and

(4)     42 U.S.C. Section 1983, for violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

The jurisdiction of this Court is authorized by 18 U.S.C. Section 1964 (c), 42 U.S.C. Section 3613, 28 U.S.C. Section 1331 and 28 U.S.C. Section 1343.

2

This Court has supplemental jurisdiction over the state claims herein pursuant to 28 U.S.C. Section 1367, as Plaintiffs are alleging state claims arising from a common nucleus of operative facts with Plaintiffs' federal claims.

Plaintiffs seek an injunction against Defendants as authorized by 42 U.S.C. Section 3613 and/or 18 U.S.C. 1961, et seq., and/or 42 U.S.C. Section 1982.

VENUE

Venue herein is proper under 18 U.S.C. Section 1965 (a), 42 U.S.C. Section 3610 (d) and 28 U.S.C. Section 1391(b).

PARTIES

1.      Frank J. Steinhauser, ("Steinhauser") is a citizen of the United States, and is a resident of Minnesota.

2.      Mark E. Meysembourg ("Meysembourg") is a citizen of the United States, and is a resident of Florida.

3.      Kelly G. Brisson ("Brisson") is a citizen of the United States, and is a resident of Minnesota.

4.      Defendant Randy Kelly ("Kelly") is a citizen of the United States, and is a resident of Minnesota.  Kelly is the Mayor of Defendant City and was Mayor at all times relevant to the allegations contained herein.

5.      Defendant Andy Dawkins ("Dawkins") is a citizen of the United States, and is a resident of Minnesota.  Dawkins is the Director of the City's Department of Neighborhood Housing and Property Improvement ("Housing Department") and Director of the Problem Property Unit

3

(hereinafter, "PPU"); he held said City positions at all times relevant to the allegations contained herein.

6.      Defendant Lisa Martin ("Martin") is a citizen of the United States, and is a resident of Minnesota.  Martin is a code enforcement officer for the Housing  Department and is a member of PPU; she held those City positions at all times relevant to the allegations contained herein.

7.      Defendant Steve Magner ("Magner") is a citizen of the United States, and is a resident of Minnesota.  Magner is a supervisor for the Housing Department; he held that position at all times relevant to the allegations contained herein.

8.      Defendant Dean Koehnen ("Koehnen") is a citizen of the United States, and is a resident of Minnesota.  Koehnen was a law enforcement officer for Defendant City and assigned to the Housing Department and PPU at all times relevant to the allegations contained herein.

9.      Defendant John Doe and Jane Doe, are citizens of the United States, and are residents of Minnesota.  Defendants John Doe and Jane Doe, whose identities are unknown at this time, were at all times relevant to the allegations contained herein, code enforcement officers, law enforcement officers, or other City officials or employees, working with, or within, the Housing Department, PPU, Fire Department, and other city offices, coordinating their activities with Kelly, Dawkins, Martin, Magner,  Koehnen and others.

10.      Defendant City of Saint Paul ("City") is a municipal corporation existing under and by virtue of the laws of the State of Minnesota.

INTRODUCTORY FACTUAL ALLEGATIONS

<u>Plaintiff Property Owners Targeted With Discriminatory Code Enforcement</u>

11.      At all times relevant to the allegations herein, Plaintiffs were property owners with

rental units located within the City.  At all times relevant herein, Plaintiffs' tenants were almost exclusively African-Americans, Hispanics, mixed race couples, individuals with various disabilities, individuals receiving state and federal financial assistance, and families with children, who were individuals protected under anti-discrimination laws, hereinafter defined as "protected class."

12.    At all times relevant to the allegations herein, Steinhauser was the owner of fifteen (15) rental properties containing twenty-two (22) rental units within the City, including properties located at 910 6th Street, 1024 Euclid and 118 Litchfield.

13.    At all times relevant herein, more than ninety (90) percent of Steinhauser's tenants were members of the protected class.  Steinhauser received many of his tenants from Project Hope, a St. Paul based nonprofit housing organization.

14.    At all times relevant herein, Meysembourg was the owner of five (5) rental properties, containing nine (9) rental units, in the City.  One of Meysembourg's rental properties in the City was a duplex property located at 970 Euclid Street.

15.    At all times relevant herein, approximately seventy (70) percent of Meysembourg's tenants were African-Americans and Hispanics.  All of Meysembourg's tenants were of lower income and many were receiving financial assistance.

16.    At all times relevant herein, Brisson was the owner of a duplex rental property located at 297 Burgess Street in the City.   Brisson rented the lower unit of his duplex to a Social Security Disability recipient.  Brisson lived in the upstairs unit.

Other St. Paul Property Owners Targeted With Discriminatory Code Enforcement

17.    Bee Vue and his wife were, at all times relevant herein, owners of twenty-four (24)

5

rental properties located in the City.   Approximately seventy (70) percent of Vues' tenants were members of the protected class, including Asians.

18.      Steve Johnson was, at all times relevant herein, an owner of forty-eight (48) rental properties located in the City.  Approximately ninety (90) percent of Johnson's tenants have been members of the protected class.  Johnson receives many of his tenants from Project Hope.

19.      Leroy Miller was, at all times relevant herein, an owner of a rental duplex located in the City.  Miller was renting one of the rental units to a Hispanic woman.  Prior to the City's condemnation of Miller's rental property in 2003, Miller had reached an agreement with an African-American to rent the second unit in his building.

20.      Steve Mark was, at all times relevant herein, an owner of twelve (12) rental properties with 32 rental units located in the City.  More than sixty (60) percent of Mark's tenants have been members of the protected class.

21.      Kenneth Krahn was, at all times relevant herein, an owner of rental properties located in the City.   Krahn received tenants through Project Hope.  On information and belief, Krahn's tenants also consisted of people of color and other protected class members.

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

Office of Citizen's Services

22.      Until approximately June 2002, the City's Office of Citizen's Services contained a Code Enforcement Division that was responsible for housing code inspections of single family and duplex rental units.  In approximately June 2002, Kelly formed a new Department for housing code enforcement, called the "Neighborhood Housing and Property Improvement Department ("Housing

Department"). Thereafter, Kelly appointed Dawkins as director of the Housing Department.

St. Paul's History of Controversial Condemnations

23.      In 1992, the City created a community crime prevention (CCP) program called

"Focusing Our Resources on Community Empowerment" ("FORCE"). The FORCE unit worked with

the assistance of neighborhood residents in an anti-drug effort in certain sections of St. Paul. A housing

inspector accompanied police officers on drug raids and the inspectors conducted code inspections.

24.      This coordinated activity by the City allowed the City to condemn a single rental

unit, multiple units or an entire rental building and thereby force out tenants, whether or not drugs were

found on the premises. As a result of the FORCE raids, condemnations and orders to vacate, innocent

families with children were forced onto the street, usually within 24 hours, and without a hearing. The

City's action was creating more homeless individuals and families.

25.      In the Fall of 1995, the St. Paul Tenants Union ("SPTU") prepared a court

challenge to the City's policy of having an inspector accompany police during raids. SPTU challenged

the lack of notice to tenants of their right to appeal the condemnations. SPTU concluded that the

methods of the City's FORCE unit "show how authorities can use the term 'community-based' to

stretch the boundaries of fairness and target 'the dangerous classes' - usually lower-income renters and

racial minorities."

26.      As a result of SPTU's threatened legal action, the City, in December 1995, agreed

to, among other measures, discontinue the practice of having a housing inspector accompany the police

in FORCE raids.

7

27.     On information and belief, at some point following Kelly's election as Mayor, and

Dawkins appointment, said Defendants, with the approval of the City Council ("Council"), made the

decision to adopt and implement the former City policy, custom and practice of having inspectors

perform inspections in coordination with drug raids.   Dick Lippert, an Inspector and Code Enforcement

Officer for the City, under the direction of Dawkins, was assigned to the FORCE Unit.

<u>Saint Paul Public Housing Agency</u>

28.     The Saint Paul Public Housing Agency ("PHA"), an independent government

agency since 1977, administers a federal rent subsidy program for low income households.  This

program is called the Section 8 Existing Housing Assistance Program ("Section 8").  While the agency

receives no financial support from City taxes, the PHA is governed by a Board of Commissioners

appointed by the Mayor and approved by the Council.

29.     PHA administers over 3,700 Section 8 certificates and vouchers which pay federal

rent subsidies to private property owners who rent to eligible low-income households.

30.     PHA also <u>owns and manages</u> almost 4,300 rental units of low income housing in

the City with funding from the United States Department of Housing and Urban Development (HUD).

31.     PHA's <u>public</u> rental housing stock has similar maintenance, repair, and behavior

problems to the rental properties of Plaintiffs and other private landlords renting to protected class

members in the City.

32.     As part of the rent subsidy application process for protected class members in

private rental properties, PHA housing inspectors conduct inspections on Section 8 rental units.  PHA

claims that as part of its housing inspections "vacant [rental] units are prepared to high standards for

each new resident" in order to meet local codes and HUD's standards.  PHA conducts inspections of

Section 8 rental units in the City at least annually.

## Project Hope

33.     Project Hope is a St. Paul based nonprofit organization promoting permanent

housing options for homeless citizens in the City.  Project Hope assists members of the "protected

class."  Project Hope is funded by contributions from HUD.

34.     Project Hope caseworkers are familiar with housing standards and procedures

and work together with many City landlords to find permanent housing for the City's homeless.  At all

times relevant herein, Steinhauser and other St. Paul landlords, including Johnson, Krahn and Mark,

have assisted Project Hope clients in finding permanent housing.

35.     City officials have informed at least one Project Hope case worker that they do

not want low income people renting in St. Paul.  City officials have also informed Krahn that the City

does not want him renting to Project Hope individuals.

## Community Stabilization Project

36.     A St. Paul based organization that has worked closely together with the City's

Housing Department at all times relevant to the allegations herein, is the Community Stabilization Project

("CSP").

37.     CSP claims to be a St. Paul community-based nonprofit organization that assists tenants

in obtaining necessary repairs to their homes.  On information and belief, CSP is copied on most, if not

all, City inspection Correction Orders, Abatement Orders and Condemnation Notices issued by

Defendants, especially on PPU matters.  CSP claims that eighty (80) percent of its work involves

9

negotiations between tenants and landlords regarding repair issues.

38.     At all times relevant herein, CSP assisted Defendants in the complaint process

leading to inspections by Defendants.  CSP personnel attended inspections of properties conducted by

Defendants and CSP was copied on most, if not all, City inspection reports, generated by Dawkins and

his inspectors.   A top official at CSP, who works directly with Defendants in the City's coordinated

code enforcement actions, has threatened a Project Hope case worker and ordered her not to place

any more Project Hope clients into Steinhauser's properties.

<u>City's March 2002 Report on "Chronic Problem Properties" Reveals Defendants' Motive and
Opportunity to Target Plaintiffs and Their "Protected Class" Tenants</u>

39.     At the direction of the City Council, a report on the City's "Chronic Problem

Properties" was prepared by the Council's Research Center and presented to the Council and the

public in March, 2002.  The Report outlined many of the problems facing private landlords, tenants,

other citizens and the City.

40.     The City's March 2002 Report detailed the prior efforts of the City to address

"problem properties" and other housing related problems, in the City.  The Report quantified the

number of "Chronic Problem Properties" at "220-280" out of a total of approximately 79,000

properties.

41.     The City's March 2002 Report outlined the City's prior experience with "problem

properties".  In 2000, the City launched an initiative called "Problem Properties 2000" (hereinafter

"PP2000) in response to media reports questioning the efficacy of the City's code enforcement

activities.  The Council's study acknowledged that City policy, custom and practice applied to "some"

10

problem properties included a knowing and intentional lack of published or documented standards for selectively targeting a property for increased code enforcement as a "problem property". The Council determined that City code enforcement officials and officers, through the PP2000 initiative, identified "some problem owners through a process Code Enforcement officials were consistently unwilling to document or even describe" as it was feared by officials that documenting the selection criteria might not always select the "right" property owners and "might provide a basis for those selected for special attention to challenge their inclusion." The Council Report also determined that, "Since the selection criteria were unknown and undocumented, there could be no basis for challenge" and that although "code enforcement officials consistently denied they were "targeting" selected owners, the fact they were selectively targeted "seemed obvious."

42.    The City's March 2002 Report also stated the PP2000 approach was to call selected property owners in for a meeting with Code Enforcement officials. It was believed these meetings were successful in convincing some problem owners to "clean up their act" or to "get out of the business" by selling their St. Paul properties.

43.    The City's March 2002 Report to the Counsel reviewed how multiple city agencies, including fire, police, housing, and animal control, could target enforcement to accomplish the goals of gaining access to interiors of homes for inspections, so as to force ownership changes on landlords who did not meet the admittedly undocumented standards.

44.    The City's March 2002 Report also summarized the City's policy, custom and practice regarding condemnations of rental units in the City. "When a building is condemned, occupants must vacate the property. It cannot be re-inhabited until inspected and approved by the appropriate City

11

officials.  Condemnations are also sometimes used as a sanction of last resort when owners refuse to

correct serious threats to the inhabitants' safety."  The Report also noted that, "Inspectors are loath to

issue condemnations because it means occupants must vacate and often have no where else to live.

Inspectors are very reluctant to make people homeless."

45.     The City's March 2002 Report also noted that although City code officials

issued orders of condemnation for eleven of 32 properties studied in preparation of the Report, "no one

was actually forced to vacate."  "Every time, the placard was lifted before anyone actually had to move

out."  The Report stated, "This is not always the case as there are instances where vacations do occur."

 "Condemnation orders usually result in corrections being made, at least to the extent that occupants are

not forced to evacuate the premise." The Council stated that it could not determine, "Whether this is

because owners make needed corrections or inspectors relent, when faced with actually making

occupants homeless."

46.     Through the chronic problem property study and the City's March 2002 Report, the

Council determined that, "The prospect of being forced out of their (owner's) home or losing the

income from tenants can be a very effective enforcement tool when nothing else seems to work," but "It

is not, however, very effective with large apartment buildings as owners know that the City is loath to

make large numbers of people evacuate."

<u>Fire Prevention Division of City's Fire Department.</u>

47.     The Fire Prevention Division of the City Fire Department ("Fire Department")

conducts inspections of buildings that contain three or more rental units within a building.  A Certificate

of Occupancy (C of O) is issued by the Fire Department to owners if those rental units pass an

inspection.  Thereafter, a building must pass the C of O inspection every two years.

48.     The March 2002 Chronic Problem Properties Report noted that

under the C of O inspection program, "its effectiveness is limited by the Fire Department's reticence to

order tenants to vacate a building because the owner does not have a current C of O."  The Report

noted that the "consequences of effecting such an order can be devastating to tenants who have no

where else to go" and that "This is particularly the case with large buildings where vacation could result

in the displacement of large numbers of tenants."  The Report finally noted that "Recalcitrant owners

who are willing to challenge the Fire Department can often continue to operate their substandard

building despite the Fire Department's refusal to issue a C of O."

<u>City Adopts New Housing Code Enforcement Rules Following March 2002 Report</u>

49.     Following City Council and City staff analysis of the March 2002 Report, new rules

went into effect on August 14, 2002, concerning rental property inspections, code compliance and

nuisance abatement.  The City also formally established the PPU.

50.     These new rules were announced by mail and on the City's website, among other ways,

and these announcements reported that the "time lines for getting your property cleaned up have been

shortened considerably" and "criminal misdemeanor citations will be issued routinely until property

owners get the message that we are cleaning up this city."  The City announcements also stated that,

"the court system has agreed to back up our tags with serious penalties.  If we have to come back to a

property a third time because you haven't gotten the message, you may very well be facing jail time."

51.     The new Code rules incorporated written notice requirements and the notice

requirements also included claimed conformity with due process requirements. Notice requirements

13

were not waived for access to rental units by enforcement officers except for an emergency condition where there was insufficient time to obtain a warrant.

52.     On June 2, 2003, the City announced receipt of $12.5 million in federal grants to provide low-income housing and economic development opportunities in the City.

53.     On December 31, 2003, the City announced by mail and through its web site that the "new Year" brings tougher housing codes in St. Paul.

54.     The December 31, 2003, City announcement also included statements from Dawkins and Kelly that they expected to see a four-fold increase in apartment safety inspections in 2004, from approximately 2,000 to approximately 8,000 inspections.

55.     The December 2003, City announcement also stated, according to Kelly: "These changes target the bad apples" and "they don't increase burdens unnecessarily for responsible property owners and in fact they reduce burdens for law abiding property owners."

56.     The December 2003, City announcement also stated that, "the rental registration ordinance lays out clear guidelines and increased procedural protections."  The announcement also stated if a landlord has a single incident of documented nuisance behavior or repeat code visits, they will receive a notice of intent to revoke the registration certificate; the landlord will then be asked to contact Dawkins and present a plan of action to correct the problem and allow an interior inspection."

57.     The December 2003, City announcement stated that if the property owners do not comply and agree to better lease-management practices, the Council can revoke their rental registration certificate, thereby requiring an interior inspection before being issued a new certificate.

58.     The substance of the City's mailings and web site information on the new housing rules being implemented in 2002 and 2003, confirmed that interior inspections would normally never be conducted absent an emergency or reasonable prior notice, and would normally follow exterior inspections, and that prior to any criminal liability proceedings or jeopardy of the property adverse to a landlord, proper inspections would be conducted, reports prepared, and timely written notice would be provided and time to correct any problems allowed.

59.     Under Kelly and Dawkins' control, the Housing Department has claimed that it seeks to enforce minimum property maintenance standards and ordinances on one and two family dwellings (duplexes) and exterior of properties across the City on a consistent basis.  For example, the Department has claimed that it will allow "no accumulated garbage, no tall grass and weeds, no junk cars, no broken windows, etc. plus minimum life-safety standards for housing structures and interiors."

60.     In August 2002, Dawkins was responsible for promulgation of new Rules and Procedures for conducting code enforcement activities in the City.

61.     The Rules, Part IV titled, "When Do We Condemn A Building," provide in pertinent part that, "Whenever a structure is deemed dangerous or unfit for human habitation, we will order the structure vacated, sometimes immediately, but usually after a short compliance period has expired and the occupants are given one to 30 days to find alternative shelter."

62.     The Rules, Part IV. F, provide further that, "Condemnation occurs when life-safety violations exist, such as fire hazards, unsanitary conditions, severe rodent and pest infestation, lack of basic facilities, faulty construction or dilapidation. If principal violations are corrected prior to the

15

vacation date, the order to vacate the building will be lifted. If principal violations are corrected after the vacate date, once corrected the dwelling can be re occupied."

The Problem Property Unit

63.     After Dawkins' appointment, he created and managed a "Problem Property Unit," ("PPU") which consisted of Dawkins, two City code enforcement officers, two police officers, and an Assistant City Attorney.

64.     Martin and Koehnen were, at all times relevant to the allegations contained herein, members of the PPU and were under the direct supervision of Dawkins, Magner and Kelly.  At all times relevant herein, Assistant City Attorney Maureen Dolan has been a member of the PPU.

65.     On information and belief, Dawkins meets regularly with Kelly on the activities of the Housing Department and the PPU and Dawkins receives direction from Kelly on managing the daily activities of the Department and the PPU.

66.     A "Problem Property" is defined by Dawkins and members of the PPU as a building where "both building maintenance issues and nuisance behavior issues" exist.

Problem Properties List

67.     Following Dawkins appointment, he created periodic lists containing rental buildings considered by PPU to be "Problem Properties."  These problem properties were then subject to increased code enforcement activities by Dawkins, Martin, Koehnen, Magner, Dolan and others, including attempts to gain access to interiors of rental properties and to force sale of the properties.

68.     Dawkins placed Steinhauser properties on the "Problem Property List." Meysembourg's and Brisson's properties were subject to increased code enforcement; however,

16

Meysembourg and Brisson are without knowledge of whether Dawkins and others placed Meysembourg's and Brisson's properties on the City's "Problem Property" list during the time their properties were targeted.

69.     The new rules provided that once the Defendants initially targeted one of a landlords properties with their discriminatory and retaliatory policy, custom and practice, the Defendants were authorized to retaliate against all of that landlord's properties.

70.     Defendants targeted landlords and tenants whether or not they were on the problem property list.

<u>Dawkins Obtains District Court Agreement to Enforce New Rules and Policies</u>

71.     After Dawkins became Director of the Housing Department, he made statements to Steinhauser and a Project Hope's case worker, at a meeting with Dawkins on October 8, 2002, to the effect that the new code enforcement policies had been approved by Kelly, and Dawkins had talked to certain court personnel with authority and had been assured that the Court would treat any violations of Dawkins' new rules "as serious offenses" and that the Court would go along with enforcement of the new housing policies.

72.     The October 8, 2002, meeting between Dawkins, Steinhauser and the Project Hope case worker, was for the purpose of discussing Steinhauser's duplex located at 910 6th Street East that one of Project Hope's clients had been leasing for a couple of months.

73.     At the October 8, 2002, meeting, Dawkins informed Steinhauser that the City was going to start looking at the volume of police calls from every rental property and that the properties with the higher number of calls and police service would be aggressively targeted by the City for housing

17

code enforcement.  Dawkins said that Mayor Kelly wanted him to get rid of the "problem tenants," the people in the nuisance properties.  Dawkins had a large flow chart representing the way the City was going to respond to complaints regarding rental properties.  He stated the City would help the landlords in court in evicting "problems tenants" and that the City wanted to do background and police checks on all tenants that Steinhauser and other landlords were renting to and would be renting to.

74.     At the October 8, 2002, meeting, Dawkins said that he and others wanted to gain access to the inside of all rental properties before tenants moved into the units, and gain access to all of the rental units of Project Hope clients, either before or after the tenants moved in.

75.     During the October 8, 2002, meeting, Dawkins said that under the current  program of inspections, a police officer accompanied a code inspector when approaching tenants.  Project Hope's case worker told Dawkins that tenants would feel compelled to let the inspector and police officer into their apartments because of the police presence at their door and that if the City condemned a unit, the client and family would be put out on the street without a place to live.  The case worker also expressed her concern that the City would be violating the civil rights of Project Hope's clients.

76.     At this same meeting, Steinhauser showed Dawkins a list of other properties in the neighborhood of Steinhauser's 910 6th East duplex that had obvious code violations; these properties had problems that the City claimed it was concerned about.  Steinhauser asked Dawkins why the City was focusing on his properties when there were so many other properties near his properties that had significant problems.  Steinhauser said that he was taking care of his properties and that people should not be complaining.  Dawkins did not respond.

18

77.     At the October 8, 2002, meeting, Dawkins told Steinhauser that Dawkins and the City would work with him and Project Hope.  Steinhauser agreed to have his potential tenants screened by the City.  Dawkins then shook hands with Steinhauser and the case worker and the meeting ended.

<u>Dramatic Increase in Code Enforcement Actions After Dawkins Appointed</u>

78.     Following Dawkins appointment to head the Housing Department, Dawkins and members of the PPU managed a dramatic increase in housing inspection activity, issuance of criminal citations, issuance of written Correction Orders, Notices of Condemnations and Orders to Vacate, as well as Tenant Remedies Actions by the City against property owners.

<u>Discriminatory Code Enforcement Operations</u>

79.     Dawkins, at the direction of Kelly, directed Martin, Magner, Koehnen and other code enforcement officers, and members of the PPU, to increase the number of exterior inspections on housing units in the City and to gain access to units in order to conduct interior inspections.  Defendants increased housing inspections from 3,267 during the period of January through March 2002, to 6,641 during the same period in 2003.

80.     The City housing inspection system had been based upon a "complaint system" resulting in widely known difficulty for City inspectors gaining access to interiors of single family, duplex and larger rental units within the City.

81.     In an attempt to gain access to interiors of single family homes and duplexes through forced consent, Kelly and Dawkins ordered PPU member, Police Officer Koehnen, to conduct housing inspections with Martin.  Koehnen, over 6' 5" foot tall with a large physical frame, was the perfect candidate for the job of gaining inside access to the homes of St. Paul residents.

19

82.     Kelly and Dawkins, with the consent of the City Council, ordered housing

inspectors, including named Defendant code enforcement officers and others unknown to Plaintiffs at

this time, to aggressively enforce the City's housing code in order to rid the City of "bottom of the

barrel," "undesirables," "down 'n outers" and "low income" individuals.  A very large majority of St.

Paul individuals targeted by Defendants were members of the protected class.

83.     On information and belief, Kelly and Dawkins reached agreement with certain

Fire Department inspection officials to aggressively enforce codes on all properties in the City that Kelly

and Dawkins and others directed be targeted.  This agreement undercut enforcement against landlords

with large number of units and focused retaliation against small landlords, such as Plaintiffs.

84.     Thereafter, Kelly, Dawkins, Martin, Magner, Koehnen and other housing and fire

inspectors selectively targeted for discriminatory code enforcement operations, rental properties with

tenants consisting of what Defendants and other City employees called, "bottom of the barrel,"

"undesirables" and "low income" individuals, who in reality were members of the protected class.

85.     Kelly, Dawkins, Martin, Magner, Koehnen and members of the PPU,

as well as inspectors from the Fire Department, knew and intended that their aggressive code

enforcement operations against Plaintiffs, other landlords, and their tenants would have a discriminatory

impact upon members of the "protected class" living within the City.  Said Defendants also knew and

intended that such enforcement would directly contradict the purported purposes of the federal funds

received by the City and the stated due process rights and procedures incorporated into the City Code.

86.     In the fall of 2002, as part of the policy, custom and practice once again

implemented by Kelly and Dawkins with the approval of the Council, and continuing presently in the

20

City, Kelly and Dawkins directed housing inspectors to once again perform code inspections in

coordination with drug raids by law enforcement agencies.

      87.    During the Fall of 2002, Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and

Jane Doe, members of the PPU, and certain members of the Fire Department, all with the approval of

the Council, intentionally and maliciously commenced and continued a policy, custom and practice of

discriminatory code enforcement that aggressively targeted Plaintiffs and other St. Paul landlords, who

were lawfully renting to, encouraging, and associating with, individuals with protected rights to housing

under Title VIII, Federal Fair Housing Act and Amendments living within the City of St. Paul.  This

discriminatory policy, custom and practice had a discriminatory impact on the protected class, and the

policy, custom and practice continued at all times thereafter and continues presently in the City.

      88.    Defendants' discriminatory code enforcement policy, custom and practice was

intentional and malicious in Defendants' efforts to rid the City of members of the protected class and

private landlords that rented to protected class members.  This intentional and malicious conduct directly

caused Steinhauser, Meysembourg and Brisson and other landlords to be damaged in their property or

business.

      89.    Defendants' discriminatory code enforcement policy, custom and practice

included, but was not limited to, intentionally and maliciously making illegal entries and searches at

Plaintiffs' rental units through forced entry or forced consent from frightened City resident tenants, all in

violation of constitutional rights and the City's housing Code due process provisions.  Martin and

Koehnen were involved in execution of these illegal entries and searches commencing in the fall of 2002,

and continuing thereafter, all at the direction and with the supervision of Kelly and Dawkins, and with

21

the approval of the Council.  Others unknown at this time to Plaintiffs were involved in the execution and

supervision of these illegal entries and searches.

90.     Dawkins, Martin and Koehnen and others unknown to Plaintiffs at this time,

conducted illegal entries and searches of housing properties within the City during 2002 and 2003,

included the following entries and searches by Martin and Koehnen:  Steinhauser's property located at

910 6th Street on or about October 17, 2002 and October 22, 2002; Steinhauser's property located at

118 Litchfield on or about November 15, 2002; and Meysembourg's property located at 970 Euclid

Street, on or about November 15, 2002, and subsequently.   On information and belief, said

Defendants, in coordination with other unknown persons, conducted illegal searches of the interiors of

housing units of other St. Paul landlords and property owners within the City during this same period,

including Miller's property located at 12 Oakley Avenue on or about August 21, 2003.

91.     Said Defendants did not have consent or administrative search warrants, and no

emergency existed at the time of these described illegal entries and searches and no other legal basis for

Defendants' entry existed.

92.     Law enforcement authorities working together with Defendants conducted other entries

and searches of homes in the City wherein either owners or tenants were arrested on questionable

warrants, and these City residents were later released from confinement without any charges being filed.

 In these cases, city code enforcement officers accompanied law enforcement officers on the arrest raids

into St. Paul homes and then immediately condemned the homes, thereby forcing all occupants to

vacate.  Brisson's rights were violated in this fashion by the City during a raid on his home on or about

October 9, 2003.  Steve Johnson's and his tenant's rights were violated by similar conduct during a raid

on or about March 13, 2003, on Johnson's rental property located at 941 Cypress.

93.     Defendants' policy, custom and practice of making illegal entries and searches of rental units were in violation of the constitutional rights of Plaintiffs and their tenants and others to be free from unreasonable searches and seizures.  Defendants' policy, custom and practice also violated the Code enforcement ordinance on access to interiors of homes publicized by the City by mail and through its web site.

94.     Defendants' policy, custom and practice of illegal entries and searches directly damaged Plaintiffs in their business or property when Defendants through their illegal entry, condemned Plaintiffs' rental properties and Plaintiffs' tenants were forced to vacate their rental homes.  As a direct result of Defendants' malicious conduct, Plaintiffs' rental payments were interrupted and lost, Plaintiffs were forced to incur unnecessary expenses including unnecessary repairs, were forced to provide payments to tenants for alternative housing, and incurred other costs, including attorney, accounting, court costs and other fees, all involving transfers of funds from federally insured banks.

95.     On information and belief, Kelly, Dawkins, Martin and Koehnen and others unknown to Plaintiffs at this time, continue their policy, custom and practice of illegal entries into and searches of interior spaces of homes and rental units within the City of St. Paul.

96.     Defendants discriminatory code enforcement policy, custom and practice included, but was not limited to, Dawkins, Martin, Magner and Koehnen maliciously and fraudulently, claiming false code violations related to Plaintiffs' and other landlords' rental properties during the period of 2002 and 2004. Defendants described these false code violations in written Correction Orders and Notices of Condemnation, all mailed to Plaintiffs and others with an interest in the properties

23

during the period commencing in the fall of 2002 and continuing through 2004.   Said discriminatory

policy, custom and practice continues in the City.

97.     Dawkins, Martin, Magner and Koehnen intentionally created false statements in City

records and notices in order to force discriminatory condemnations on Plaintiffs' rental buildings and

those of other St. Paul landlords.  This wrongful conduct by Defendants damaged the businesses and

properties of Plaintiffs and other landlords targeted and caused injury to tenants.

98.     Defendants' malicious conduct was in direct contradiction to the purposes for

which the City accepted federal funds for low income residents, and this malicious conduct interfered

with Plaintiffs in their provision of housing services to low income, protected class members.  Said

Defendants' discriminatory policy, custom and practice continues in the City.

99.     Defendants' discriminatory code enforcement policy, custom and practice

included, but was not limited to, Dawkins and other members of the PPU maliciously preparing and

filing court papers for Defendant City against Steinhauser and Meysembourg and other City landlords,

including Mahannah Kakish, Miller, Krahn, Vues, and others unknown to Plaintiffs at this time, including

filing court Complaints and related pleading documents, attached exhibits and sworn Verifications, in

numerous tenant remedies court actions during the period commencing in the fall of 2002 and continuing

to present.  Defendant Dawkins and other members of the PPU, including Martin, Koehnen and Dolan

and others, knew that these court filings contained intentionally false and malicious statements

concerning rental properties that housed protected class tenants.

100.     Defendants' court filings described above, included false statements in said pleadings

and inspection records prepared by Dawkins, Martin and Koehnen and others with the assistance of the

24

City Attorney's personnel, including Attorney Dolan.    Defendants' court filings were mailed to

Plaintiffs, other landlords and occupants of the rental properties.  Said discriminatory policy, custom and

practice continues in the City.

       101.    Defendants' mailings, as part of their fraudulent scheme, caused Plaintiffs' funds, and/or

other landlords' funds, and/or tenants' funds, and/or City funds and/or contractors' funds and/or federal

funds, to be transferred in furtherance of Defendants' scheme.  Defendants' mailings triggered issuance,

or transfers, of funds held in federal banking institutions, including funds related to Section 8 and HUD

financial assistance, or other funds for the benefit of tenants or Plaintiffs, or other landlords, or for

payments related to City permit fees, Code Compliance fees, other City fees and fees for court filings

and process.  For example, Steinhauser was forced by said Defendants' fraudulent actions to use an

out-of-state credit card to pay for expenses directly related to Defendants' scheme.

       102.    Dawkins provided sworn Verifications of the truth of each such court Complaint

and the truth of the attachments of City inspection records, when in fact such Complaints and

attachments contained false statements of fact that Dawkins and other said Defendants knew to be false,

and which were intentionally made by Dawkins, Martin, Koehnen, Dolan, other members of the PPU,

and other members of the City Attorney's office, with the intent to harm Plaintiffs, other landlords and

tenants, including members of the "protected class".  Said discriminatory policy, custom and practice

continues in the City.

       103.    Defendants' discriminatory code enforcement policy, custom and practice

included, but was not limited to, maliciously breaching settlement agreements fraudulently induced with

Plaintiffs and other St. Paul landlords through fraudulent court filings set forth above.  During

25

discriminatory court actions against Plaintiffs and other landlords, Defendants misrepresented to Steinhauser and Meysembourg, and also to Miller, that a "code compliance" meant compliance of the home with the codes "as built".   After settlement was fraudulently induced and final, Defendants maliciously claimed, and took action to enforce, a "code compliance" that required each subject building to be brought up to <u>present</u> code thereby eliminating the grand-fathering of the properties.  Said discriminatory policy, custom and practice continues in the City of St. Paul under color of law or official right.

104.    Dawkins, Martin, Koehnen, Magner and Attorney Dolan, and other city officials and attorneys knowingly made these misrepresentations in order to fraudulently induce said landlords to waive their legal rights and to intentionally place oppressive financial burdens upon said landlords in an effort to run them out of town or to raise the cost of doing business to the point that said landlords could not afford to stay in business or continue renting to protected class tenants, and to discourage or prevent Plaintiffs and others from testifying before or participating in HUD proceedings, DEA proceedings, Federal Fair Housing proceedings, and/or other joint state and federal proceedings.

105.    As a direct result of said Defendants' wrongful and malicious breach of the settlement terms, Meysembourg and Steinhauser and Leroy Miller, and others unknown to Plaintiffs at this time, were forced to incur significant expense that was unnecessary and which placed a heavy financial burden on said landlords and forced them to close their rental units, and sell other rental property, thereby decreasing the available rental units for protected class members in the City.

106.    Defendants also obtained, under color of law or official right, an increase of inspection and permit and other related City fees from Plaintiffs and other landlords due to the actual "code

26

compliance." Said Defendants' malicious conduct triggered issuance or transfer of Plaintiffs' funds and/or other landlord's funds, and/or tenant funds, and/or City funds and/or contractor funds, and/or federal funds, held in federal banking institutions.

107.    Defendants' discriminatory code enforcement policy, custom and practice included, but was not limited to, Dawkins, Martin, Magner, Koehnen, and other members of the PPU, and the City, maliciously encouraging third parties working together with Defendants to make false claims of code violations in Plaintiffs' properties and properties of other St. Paul landlords, in order to further discriminatory agendas of Defendants and these third parties to rid the "bottom of the barrel," "nondesirable" and "low income" tenants from the City. Said discriminatory policy, custom and practice continues in the City.

108.    Defendants' discriminatory code enforcement policy and conduct included, but was not limited to, Dawkins, Martin, Magner, Koehnen, and other members of the PPU, and the City encouraging tenants to file false claims in court actions against selected landlords, including Plaintiffs, Krahn and Vues.

109.    Said Defendants also encouraged others working in coordination with Defendants, under color of law or official right, to file discriminatory court actions without having tenants as party-plaintiffs. In one case filed by the City against Krahn, said court action was dismissed by said Defendants when tenants would not agree with Defendants' false allegations. Said discriminatory practice continues in the City of St. Paul.

<u>Tenants Were Injured By City's Discriminatory Code Enforcement Operations</u>

110.    As a result of Defendants' illegal, malicious and discriminatory policy, custom and

practice as described fully above, including, but not limited to, illegally condemning the rental properties

of Plaintiffs, and other St. Paul landlords, protected class tenants were forced out of their homes,

sometimes in the winter, resulting in homelessness and hardship.  Said discriminatory policy, custom and

practice and resulting injury continues in the City of St. Paul.

111.    Defendants' illegal condemnation of Plaintiffs' rental properties, and the

properties of other St. Paul landlords, interfered with these tenants' ability to locate replacement housing

and with their employment, all to the tenants detriment.

112.    By way of example, one of Steinhauser's tenants, an African-American, single mother

of two, was unable to continue to work following the illegal condemnation of her apartment building.

After being forced from her home by Defendants, her only opportunity for temporary housing was too

far from the employment agency and as a result, she lost her opportunity to work to support her family.

This African-American mother and her children lived in ten temporary housing arrangments for over a

year after the illegal condemnation by Defendants.  She describes the situation as a "nightmare."

113.    Plaintiffs' tenants and their families suffered great harm as a result of the

malicious and illegal discriminatory policy, custom and practice of Defendants.

FACTUAL ALLEGATIONS RELATED TO EACH PLAINTIFF

Plaintiff Kelly Brisson

114.    Dawkins, Martin and Koehnen and others from the City were directly involved in

the intentional and malicious, discriminatory condemnation of Brisson's property located at 297 Burgess

Street.  Although numerous properties in the City had serious Code violations that Defendants ignored,

Defendants selectively targeted Brisson as part of their discriminatory policy, custom and practice.

28

115.    Plaintiff Brisson owned his duplex located at 297 Burgess Street and lived in the upper floor unit of this home.  He had purchased the duplex on a contract for deed.  Brisson desired to rent the lower unit to help pay the contract.

116.    Brisson's prospective tenant was disabled, receiving Social Security Disability payments and was eligible to receive Section 8 housing assistance from the PHA.

117.    As part of the prospective tenant's application to rent from Brisson and receive public assistance, housing inspectors from PHA completed a Section 8 inspection of Brisson's duplex on April 3, 2003.  The inspectors determined that four items needed correction and attention and Brisson immediately made the repairs.

118.    On April 14, 2003, PHA inspectors reinspected Brisson's duplex and issued approval to Brisson under Section 8.  The disabled tenant immediately moved in.

119.    Thereafter, Dawkins, Martin and Koehnen began harassing Brisson with claimed housing code violations and criminal housing citations related to his duplex.  Brisson was in the process of renovating his duplex which included repairing certain portions of the roof that had been damaged by squirrels.  As part of the renovation, debris collected on the ground.   In the summer of 2003, Defendant Martin issued Brisson two criminal citations for claimed roof, paint and trash code violations.

120.    Brisson had been a victim of identity theft and an unauthorized person ran up electric bills in his name with the utility company.  As a result, the electricity to Brisson's upstairs unit was suspended.  However, the power was still connected and available in the lower unit that Brisson's disabled tenant occupied.

121.    When Dawkins and Martin learned of the electricity suspension, Martin and Dawkins prepared a written Notice of Condemnation and Order to Vacate dated July 15, 2003, of Brisson's entire duplex, claiming the home as "Unfit For Human Habitation" and forwarded the Notice and Order to Brisson through the mail.

122.    The written Notice stated that the condemnation was based upon a "principal violation" of "Lack of Electricity" in the home and that this condition constituted a "material endangerment". This was false as there was electricity to the lower unit.

123.    In the July 15, 2003, Notice of Condemnation, Martin and Dawkins also cited eleven items that they stated were code violations on the exterior of Brisson's home. They falsely stated in their written order that the windows and screens were missing, defective or in a state of disrepair. The windows and screens were on the home and were in fine shape except that Brisson still needed to add window casing trim to the newly installed windows. Martin and Dawkins also falsely stated that there were missing or defective handrails and guardrails. In fact, only one handrail/guardrail was temporarily detached to allow building materials to be brought into the home for improvements.

124.    As a result of the wrongful condemnation of both the upper and lower units of Brisson's duplex, Brisson and his disabled tenant were forced from their homes.

125.    Brisson filed a legislative appeal of this Condemnation Order with the City. The City legislative hearing officer, and later the City Council, denied his appeal.

126.    On August 7, 2003, Martin again inspected Brisson's home. On August 12, 2003, Dawkins and Martin prepared and issued a Revised Notice of Condemnation that again listed the "Lack of Electricity" and eleven other violations listed on the July 15, 2003, Notice of Condemnation. Again,

Dawkins and Martin forwarded this written Notice and Order to Brisson by mail.

127.    Martin and Dawkins also listed on the Revised Notice twelve additional interior code violations claimed to have been discovered during Martin's interior inspection on August 7, 2003. The Revised Notice included a total of 24 items and stated that due to the amount of violations, Code Enforcement required a Code Compliance Certificate before the condemnation was lifted.

128.    Many of the items listed by Martin and Dawkins as violations on the August 12, 2003, Revised Notice of Condemnation were false. They falsely listed the lack of electricity to the building when in fact only the upstairs unit was disconnected. Martin and Dawkins falsely stated that the home was "Lacking deadbolt door locks" on entry doors. Every entry door did have deadbolt locks at the time of Martin's inspection and at all times before and after that. The only exception was that a deadbolt lock on one door had been knocked loose from the door after being hit with building materials; the new replacement deadbolt lock for that door was located right next to the door ready to be put back into place. Inspector Martin observed all this.

129.    In the August 12, 2003, Revised Notice of Condemnation, Martin and Dawkins also falsely stated that the windows and screens were missing, defective or in a state of disrepair. This continued to be false as the windows were new and screens were fine. Brisson was going to be adding window casing trim to the newly installed windows once a different inspector had approved the installation of the windows. Martin and Dawkins also falsely stated that the front storm doors were in disrepair. Brisson had replaced all three screen and storm doors, including the front storm door.

130.    Some of the violations that Martin and Dawkins listed in the August 12, 2003, Revised Notice were duplicates of other violations listed in the same written Notice of Condemnation,

31

but listed as separate numbers, and said Defendants maliciously duplicated these items in their effort to

inflate the number of claimed violations so Defendants could wrongfully demand a full "code

compliance" on Brisson's duplex.

131.    Because of the condemnation by said Defendants of Brisson's home and his

rental unit, Brisson was not allowed to live in his own home and his disabled tenant had to leave his

home following the July 15, 2003, condemnation and order to vacate.  Brisson lived out of his truck

following the July 2003, condemnation and order to vacate.

132.    After the July 2003, Notice of Condemnation, Brisson called Dawkins to tell

him that Brisson's home should not have been condemned.  Brisson informed Dawkins

that the lower unit did have electricity and explained the false items listed in the Notice.  Brisson asked

Dawkins to come out to look at Brisson's home to see for himself.  Dawkins refused.  Brisson

attempted many times to talk to Dawkins by phone but Dawkins would not take Brisson's calls.

133.    Through Martin's and Dawkins' illegal condemnation of Brisson's entire home,

they were able to deny Brisson the rental income he needed from his tenant to pay contract for deed

payments and repairs and to maintain his investment in his property.

134.    After Brisson received the August 12, 2003, Notice of Condemnation he filed

another legislative appeal with the City.  On August 26, 2003, Brisson attended the legislative appeal

hearing.  Brisson informed the hearing officer that his home had passed a PHA Section 8 inspection just

months before the harassment inspections by Martin and Dawkins, and Brisson described to the hearing

officer the true condition of his duplex.  The hearing officer issued a decision in Brisson's favor and

reversed the condemnation on his duplex.  One of the City's inspectors present at the hearing stated that

32

Brisson really did not need a "code compliance" on his home.

135.    On September 2, 2003, the Council upheld the hearing officer's decision
and the Condemnation was officially removed from Brisson's home.  On September 22, 2003, Brisson
received a letter by mail from Dawkins stating that the condemnation was lifted because the City had
determined that the conditions causing the condemnation and Order to Vacate, had been corrected.

136.    After the condemnation was lifted, Brisson and his tenant were able to occupy
their homes at 297 Burgess Street for almost one month.

137.    On October 3, 2003, a search warrant was requested by law enforcement
authorities seeking to find a "meth" lab on the premises of Brisson's home.  The search warrant was not
executed until six days later on October 9, 2003, when a law enforcement raid was made of Brisson's
home.

138.    Early in the morning of October 9, 2003, law enforcement officers, without
announcing their presence or authority in violation of the express terms of the search warrant, suddenly
broke down Brisson's door with a battering ram and immediately shot Brisson and his dogs with a fire
extinguisher.  Brisson had been asleep immediately before the raid.  Brisson was informed by law
enforcement officers that he was being arrested for two outstanding housing court warrants that had
been issued by Martin in June and July 2003.  Brisson was arrested and held in jail for a day and a half,
and then released from custody.  He was not charged with any crime related to the warrant.

139.    Upon Brisson's release from custody and return to his home, he discovered that
on October 9, 2003, the day law enforcement officers had raided and destroyed his home, City
inspectors had inspected his upstairs unit.  Brisson discovered that the law enforcement officers had

broken his entry door and had also torn out all of Brisson's smoke detectors in his upstairs unit; the

detectors were still there, but were hanging by their wires from the ceiling. The officers had also

punched large holes in Brisson's walls, damaged the unit's plumbing, damaged Brisson's furniture and

thrown furniture all around the unit, and caused other damage to the unit.

140.    At no time was Brisson involved with illegal drug manufacturing that would

give the government any reason to suspect him and provide probable cause to obtain a search warrant

to raid Brisson's home. Brisson was not arrested for illegal drugs, nor charged for drug possession or

illegal drug manufacturing.

141.    On October 14, 2003, Brisson once again received from Dawkins through the

mail a written Notice of Condemnation of his home. Five code deficiencies were listed as the basis for

condemnation; each of the five were directly and maliciously caused by law enforcement officers during

their raid. The Notice stated that Brisson's building could not be occupied and that the building must

be vacated by October 9, 2003, the day of the raid.

142.    Brisson once again filed a legislative appeal. This time, his appeal was denied.

Brisson then appealed to the Council. Although Brisson had pointed out to the legislative hearing

officer, and did so again to the Council, that the damage listed in the October 14, 2003, Notice was a

result of law enforcement conduct and that the damage listed related only to the upstairs unit, not the

Section 8 approved rental unit on the main floor, the Council denied his appeal and the condemnation of

the entire duplex was affirmed.

143.    As a direct result of the discriminatory policy, custom and practice by Dawkins,

Martin and Koehnen and others directed at Brisson and his tenant, Brisson lost rental income from his

tenant and then was unable to afford to pay for the full "code compliance" Defendants wrongfully

demanded in order to again occupy and rent his duplex home.  Brisson eventually had to sell his duplex

home as he could not make the payments on the contract for deed or pay for other expenses on the

duplex without rental income.  Brisson also lost thousands of dollars expended by him in remodeling and

repairing his home in order to meet the demands of Defendants, and he lost his business expectancy,

including profits.  Brisson also incurred increased living costs due to loss of his duplex home, as well as

attorney's fees, as a direct result of said Defendants' discriminatory policy, custom and practice.

144.    During the time period of Defendants' wrongful conduct directed against Brisson and his

tenant, Brisson made significant efforts to meet Defendants' demands and expended his own funds and

borrowed funds for demanded repairs and to make payments to Brisson's tenant to help him with

housing expenses.

145.    Although numerous other properties in the City had serious code violations, which

Defendants' ignored, Defendants selectively targeted Brisson and his protected class tenant as part of

their discriminatory policy, custom and practice.

<u>Plaintiff Mark Meysembourg</u>

146.    Dawkins, Martin, Magner and Koehnen were directly involved in discriminatory

code enforcement and subsequent condemnation of Meysembourg's property located at 970 Euclid

Street during the period of November 2002 through February 2003.  Although numerous other

properties in the City had serious code violations, which Defendants' ignored, Defendants selectively

targeted Meysembourg and his protected class tenants as part of their discriminatory policy, custom and

practice.

35

147.    On or about November 15, 2002, Martin and Koehnen, at the direction

of Kelly, Dawkins and Magner, conducted an interior inspection of Meysembourg's 970 Euclid rental

property.  Defendants did not have an administrative search warrant or the valid consent of the tenants

or Meysembourg.  No emergency existed justifying said Defendants' entry.  Meysembourg was <u>not</u>

provided notice of this inspection by Defendants.

148.    During the inspection, Martin and Koehnen, with malicious intent, falsely stated to the

tenants that the "landlord knows about this inspection and it's ok with him," or words to that effect.  The

tenants were also falsely told by Martin and Koehnen that they were performing an "annual inspection."

  There is no annual inspection of duplexes required in the City.

149.    As a result of this illegal entry and search, Martin and Koehnen prepared and

mailed to Meysembourg a Correction Notice dated November 15, 2002, containing false claims of

code violations.  This Correction Order was also mailed to both occupants of the duplex and to

interested parties living in Anchorage, Alaska.  Claimed code violation item number 4 (lacking deadbolt

door locks) and item number 7 (leaking plumbing) were false and item number 12 (roof is deteriorated,

defective, or in a state of disrepair) was also false as the roof had been partially replaced two years

before and was not in need of further repair.

150.    Meysembourg filed a legislative appeal detailing the claimed code violations

listed by Martin that were false.   At the hearing, Meysembourg's tenants testified on his behalf.  Police

Officer Koehnen appeared at the hearing.  Koehnen was initially in a seated position in the hearing room

but when the first of Meysembourg's tenants started to testify, Koehnen stood up and stepped into the

isle in direct line with the tenant, spread his feet, folded his arms and glared at each tenant, all in an

36

attempt to intimidate the tenant witnesses. Koehnen continued this intimating conduct through the

testimony of Meysembourg's tenants. Meysembourg's legislative appeal was denied.

      151.    Thereafter, Martin obtained an administrative search warrant and on December

31, 2002, conducted a second interior inspection of Meysembourg's 970 Euclid rental property.

Once again, in a second Correction Notice mailed to Meysembourg dated January 2, 2003, Martin

again listed the false items from the first Correction Order, including the lack of deadbolt locks and she

restated her false statement of the deteriorating roof. The January 2, 2003, Correction Order was also

mailed to both occupants of the duplex, and to interested parties in Anchorage, Alaska.

      152.    Thereafter, Meysembourg filed a formal complaint against the City claiming that

his rights had been violated.

      153.    On or about February 3, 2003, Defendants Martin, Koehnen and Steve Magner,

Martin's and Koehnen's supervisor, conducted a third inspection of 970 Euclid without advance notice

to Meysembourg, and without a search warrant or any other valid basis. Meysembourg was working at

the property when Martin, Koehnen and Magner arrived for the inspection. Meysembourg did not

provide his consent to this third search. During this third inspection, Magner informed Meysembourg

that there was a missing safety valve on one of the boilers in the duplex. Meysembourg pointed out that

Magner's assertion was false as the boilers had been serviced the previous year. After a shouting match

ensued, said Defendants left.

      154.    The next day, Dawkins, Martin, Magner and Koehnen retaliated against Meysembourg

as Dawkins issued a Notice of Condemnation and Order to Vacate dated February 3, 2003 (listing

Martin as the inspector) and mailed this Notice to one of the occupants of 970 Euclid Street and to

interested parties in Anchorage, Alaska.  Dawkins and Martin claimed in this written Condemnation

Notice that the west side boiler lacked a pressure relief value and as such this condition constituted

"material endangerment" justifying immediate condemnation of the duplex.  This was false and

maliciously stated by said Defendants in order to justify the retaliatory emergency condemnation by

Dawkins and Martin of Meysembourg's building, which was intended by said Defendants to forcibly

remove Meysembourg's tenants, including his protected class tenants, all causing damages to

Meysembourg's and his tenants.  Dawkins and Martin also falsely listed in the Notice that the "roof"

was "deteriorated" and the lack of deadbolt locks.

     155.    Meysembourg again filed a legislative appeal.  During this hearing, Meysembourg

presented evidence that the claim by Dawkins and Martin of the lack of a boiler safety relief valve was

false.  The City's hearing officer refused to look at Meysembourg's evidence and once again denied

Meysembourg's appeal.

     156.    On or about March 13, 2003, Assistant City Attorney Dolan, a member of PPU,

prepared a written tenants remedies court Complaint against Meysembourg on behalf of Defendant

City.  The Complaint included a fact statement that the duplex boiler "lacks a pressure relief valve."

This false claimed violation was listed first in a list of items that Martin, Dawkins and Dollan claimed

needed repair.  Dawkins provided a sworn verification of the truth of this Complaint, including the

statement about the boiler. The Complaint, the sworn verification and the attached Correction Orders

and Notice of Condemnation contained false statements of fact made by Dawkins and Martin.  The

Complaint, sworn Verification and City inspection documentation were mailed to Meysembourg and

filed in Ramsey County District Court.

157.    During the court proceeding, Martin and Magner, along with Attorney

Dolan, falsely and maliciously represented to Meysembourg that the "code compliance" inspection they

were demanding as a part of the settlement of the City's action against Meysembourg, was to be "as

built," and as such the building would not have to be completely brought to current code.  This false

statement was made to fraudulently induce Meysembourg to settle.

158.    Meysembourg, who had never had one of his rental properties condemned before,

relied on the false representation by Martin, Magner and Dolan to Meysembourg concerning the "as

built" code compliance.  Defendants Dawkins, Martin, Magner, Koehnen and Attorney Dolan coerced

and fraudulently induced Meysembourg to agree to settlement terms related to code compliance that

said Defendants had no intention of honoring.

159.    The following week, during Meysembourg's conversation with the City's License,

Inspection and Environment Protection ("LIEP") office, Meysembourg was informed that once LIEP

was involved, there was no such thing as "as built" code compliance, but rather LIEP only conducted

current "code compliance" inspections, which required all major systems in a rental building to be

brought up to current code requirements, thereby removing grand-fathering protections of state law.

160.    Thereafter, said Defendants required that Meysembourg bring his 970 Euclid

building up to current code, eliminating the grand-fathering protection for Meysembourg's building under

previous building codes, and resulting in tens of thousands of dollars in extra expense to Meysembourg,

as well as loss of rental income from his duplex during the period of condemnation, all to his financial

detriment.

161.     As part of LIEP's full code compliance inspection process on Meysembourg's duplex, LIEP did not require repairs to the roof, the deadbolt locks remained on the doors as before the November 15, 2002, inspection, and the boilers' pressure relief valves that were in existence at all times during 2002 and 2003 were unmodified by the LIEP inspection process.

162.     As a direct result of the discriminatory policy, custom and practice by Dawkins, Martin, Magner, Koehnen, Dolan and others, as applied to Meysembourg and his tenants, as set forth herein, Meysembourg has been forced to sell all of his rental properties in the City except for two properties, and Meysembourg has incurred or will incur increased tax burdens, and has lost rental income, profits and investments and incurred significant unnecessary expenses related to his property, and incurred attorney's fees, other fees, and costs in defense against said Defendants' discriminatory actions.

<u>Plaintiff Frank Steinhauser</u>

163.     At all times relevant herein, Steinhauser was the owner of 15 rental properties in St. Paul, including those rental properties located at 910 6th Street East, 1024 Euclid and 118 Litchfield.

164.     During 2002, a case worker with Project Hope worked with Steinhauser on more than ten occasions in placing her homeless clients into Steinhauser's rental properties in the City.  This case worker performed inspections of the rental units before placing her clients into the units.  Based upon her extensive experience with Steinhauser in 2002, she found Steinhauser's rental properties to be well maintained and that he was very responsive.   She even placed her own family members into Steinhauser's rental units.

40

165.    Prior to the fall of 2002, Steinhauser had always been responsive to inspections and repair orders on his rental properties and generally his relationship with City inspectors had been considered good.

166.    Following the October 8, 2002 meeting between Dawkins, Steinhauser and Project Hope's case worker, Dawkins, Martin and Koehnen immediately commenced a course of malicious retaliatory conduct directed at Steinhauser and Project Hope clients/tenants, in coordination with other third parties working directly with Defendants, to intentionally shut down Steinhauser's rental business or at least dramatically increase his rental business expenses that would either force him to sell off his rental properties in the City or force him to no longer rent to protected class members. Said Defendants malicious conduct was intentionally directed at eliminating rental units available to "bottom of the barrel," "undesirable" and "low income," protected class individuals Steinhauser was renting to in the City.

167.    Dawkins, Martin, Koehnen and other unknown City employees and third parties were directly involved in the condemnation of Steinhauser's properties located at 910 6th Street East and at 1024 Euclid.

168.    On or about October 17, 2002, Martin and Koehnen commenced an inspection of Steinhauser's duplex property located at 910 6th Street East. At this time, the upper unit was not inspected. Both tenants in Steinhauser's duplex were African-American mothers with children. The surrounding neighborhood was occupied by predominately white families in single family homes.

169.    Following this inspection, Martin prepared a Correction Notice dated October 18, 2002, and forwarded this Notice to Steinhauser and the occupant by mail.

41

170.   Martin's October 18, 2002, Notice, contained intentionally false statements, including that there was evidence of rodent infestation in the building, that there were sanitation issues, that the foundation was deteriorated, and that there was a lack of properly installed and operable smoke detectors.  Martin demanded that Steinhauser remove "rodent harborages" in the yard, tuck-point and repair the foundation to prevent re-infestation, and provide functioning smoke detectors by October 21, 2002.

171.   At the time of Martin's inspection, the smoke detectors were properly installed in both units of the duplex; the tenants had simply removed the batteries. There were no "rodent harborages" or sanitation issues present at the property justifying Martin's deliberately false claims.  However, the adjacent property had a large volume of trash (at least 20 cubic yards) piled up in the backyard and this may have been the source of rodents in the area.  Because of the extensive trash on the adjacent property, Steinhauser had been baiting rats at his rental property for two months prior to the inspection and Steinhauser's efforts had been successful as evidenced by the dead rat Martin and Koehnen observed on or about October 17, 2002.  The building's foundation did not need tuck-pointing and was not deteriorated.  Steinhauser had determined that his tenants had frequently not closed the outside door to the building and the rat may have entered the building through the open door.

172.   After the October 17, 2002, inspection by Martin and Koehnen, Steinhauser removed the dead rat from the basement, and worked on the other items listed in the October 18, 2002, Notice.

173.   On or about October 22, 2002, Martin and Koehnen reinspected the downstairs unit at 910 6th Street East.  Martin and Koehnen also went upstairs and knocked on the door of the

42

upstairs rental unit at 910 6th Street East and woke up the tenant, a mother of two minor children also residing with her.  When the tenant opened the door, she saw Martin and Koehnen.  Martin told the tenant that she and the officer had to come in to inspect her apartment because the downstairs apartment was being condemned and that, "We are going to be condemning other properties of Mr. Steinhauser's."  Police Officer Koehnen was towering over the tenant about two feet away from her. The tenant informed Martin and Koehnen that she did not want them in her apartment, to which Martin replied that they had to come in and that was the reason for the police officer being present.  Martin stated that it would be for the tenant's own good.  Because of the police presence, the tenant stood back and Martin and Koehnen entered her apartment.

174.    During the inspection, Martin called Steinhauser a "slum lord" and said that Steinhauser preys on poor people, African-Americans, and that Steinhauser does not repair his rental properties.  Martin encouraged the tenant to sue Steinhauser for all the money she had paid to him in rent since she had moved into the apartment over a year earlier.  The tenant informed Martin and Koehnen that Steinhauser was a good landlord to her and that he performed repairs when she asked and that Steinhauser had been at her building performing repairs for the last week.

175.    Following this re-inspection, Defendants Dawkins and Martin prepared a written Notice of Condemnation and Order to Vacate dated October 23, 2002, and forwarded this written Notice and Order to Steinhauser and the occupants of the both units through the mail.

176.    In the October 23, 2002, Notice, said Defendants listed 18 items as being in violation of Code.  Many of these statements of fact listed by said Defendants were outright false. Moreover, Defendants maliciously and falsely stated, in deliberate inflammatory fashion, that the

43

conditions present at the property constituted "material endangerment" in that the property lacked a

"basic facility" and was "infested with rats".  Martin also deliberately and maliciously falsely stated that

the building's foundation was in a state of disrepair, that there was a lack of light fixtures, that there were

plumbing leaks, that the units were lacking deadbolt locks, that the storm doors were in disrepair and

that the furnace needed attention.

177.     Many of the other items listed by Dawkins and Martin had actually been corrected by

Steinhauser by the time of the October 22, 2002, reinspection but Dawkins and Martin refused to give

Steinhauser credit for those efforts.  The property next to Steinhauser's property continued to have a

large volume of clearly visible trash.

178.     Steinhauser and a case worker from Project Hope met with Martin and Koehnen

on October 23, 2002 at the Housing Department office to discuss Steinhauser's 910 6th Street duplex.

Martin and Koehnen started out the meeting by screaming at Steinhauser and the case worker about the

condemnable conditions of the building, presenting pictures of conditions they stated demonstrated code

violations at the property. Steinhauser pointed out to Martin and Koehnen that some of the pictures

actually showed code compliance of the building.

179.     During this meeting, Koehnen, over 6'5" tall, screamed at Steinhauser and

the case worker while leaning over the table in a threatening and intimidating manner.  The case worker

became scared of Koehnen as a result of his abusive, inappropriate and unprofessional behavior.

Steinhauser was shocked at the treatment he and the case worker were receiving.  Steinhauser left the

meeting, as did the case worker a short time later, as they could no longer stand the abusive treatment

by Martin and Koehnen.

180.    Following the meeting with Martin and Koehnen, Steinhauser and the Project

Hope case worker inspected the rental building Martin and Koehnen had just condemned.  The case

worker reviewed the October 23, 2002, Condemnation Notice while  inspecting both the upper and

lower rental units in the building.  The case worker concluded that most of the code violations stated by

Dawkins, Martin and Koehnen in the Condemnation Notice were false and that the Notice had been

written in such a manner that Dawkins, Martin and Koehnen made the rental units sound very

substandard when in fact the units were very habitable.

181.    The upstairs tenant at 910 6th Street East, has stated that what was done to her, her

family and to Steinhauser, was wrong and that, "The only thing the inspector could find was the plugged

toilet and yet they condemned the unit and forced me to leave my home."  She has stated that Martin

and Koehnen "were nitpicking things in the apartment - they created a big list of problems out of nothing

during their inspection."

182.    After the initial inspection of 910 6th Street East on or about October 17, 2002,

Steinhauser continued to work on the building and corrected many of the items that needed

improvement before the October 21, 2002 deadline.  When Martin and Koehnen returned for the

second inspection on or about October 22, 2002, it became clear to the upstairs tenant that, with their

continued nitpicking, Martin and Koehnen were more interested in getting Steinhauser's building

condemned than they were in helping her and her family.

183.    As a result of the condemnation of Steinhauser's rental property at 910 6th Street

East, the African-American tenant and her children were forced to leave their home.  They were happy

there and did not want to leave.  Her children were heartbroken.  It was hard for her to find another

45

place to rent.  She and her family had to live in more than 10 different places, staying with friends, family or in shelters, until she could once again find a place of her own.  She also lost her job because of the forced eviction by Defendants.

184.    After condemning Steinhauser's 910 6th Street East duplex, Dawkins, Martin, Koehnen, Dolan and others, filed on October 30, 2002, a tenant remedies action by the City and the lower unit tenant against Steinhauser in Ramsey County District Court.   In Defendants' court action, Dawkins, Martin and Attorney Dolan and others made statements of fact to the Court, verified as true by Dawkins, that in fact were false.  These false statements were made by Defendants and others in the court papers in an unlawful and malicious attempt to shut down Steinhauser's rental property and business or to increase his costs so as to interfere with his ability to rent to protected class tenants.

185.    Dawkins deliberately made false sworn statements in the court papers including the Complaint and Verification, that Steinhauser had failed to comply with three previous Correction Notices directed at the 910 6th Street East property, and Dawkins, Martin and Koehnen falsely stated that the property had a rat infestation, inadequate heat, broken toilets and sinks, missing smoke detectors and defective ceilings and walls.   The Complaint, Verification and attached City inspection records were mailed to Steinhauser.

186.    As a result of the condemnation of his duplex and the lack of rental income from the property, Steinhauser, in an attempt to gain City approval to once again rent his property, agreed to a "code compliance" inspection.   Dawkins, Martin, Koehnen and Attorney Dolan represented to Steinhauser that the "code compliance" of the subject property would be "as built".  Defendants coerced and fraudulently induced Steinhauser's consent to the settlement including the code compliance

terms.

187.    Subsequently, Martin and Dawkins and others forced Steinhauser to undergo a full "code compliance" to current or modern code which required Steinhauser to make significant unnecessary expenditures on his rental building.  During the code compliance inspection by LIEP, one of the inspectors informed Steinhauser, "The building is really not that bad ... if you have a plugged toilet, you fix the toilet - you don't go get a code compliance."

188.    As a direct result of Defendants' discriminatory policy and conduct against Steinhauser related to his 910 6th Street East duplex, as set forth herein, Steinhauser sustained loss of rental income from two rental units at said property for an extended period of time, lost profits and investments, and incurred substantial expenses in unnecessary repairs, permit and code compliance fees, other costs and expenses, and court costs and attorney's fees.

189.    Kelly, Dawkins, Martin and Koehnen, with assistance from Attorney Dolan, made multi-directional attacks against Steinhauser during October and November 2002.  Said Defendants, and others working in concert with them, coordinated their attacks against Steinhauser's 910 6th Street East rental duplex with City inspections at other properties owned by Steinhauser during the same period, including an inspection and condemnation of a second rental property located at 1024 Euclid. Once again, African-American tenants resided in this duplex.

190.    On October 25, 2002, as part of Defendants' inspection of Steinhauser's duplex rental unit located at 1024 Euclid, Dawkins, Martin and Koehnen once again maliciously created false entries in City inspection records regarding this property.  Thereafter, said Defendants maliciously entered those false and fraudulent entries into a Notice of Condemnation dated October 28, 2002, that was

47

mailed by Defendants to Steinhauser and the occupants.

191.     Said Defendants used the false entries of code violations to immediately condemn the 1024 Euclid building on the basis of existing emergency conditions and thereby force tenants from their home.

192.     One of the false entries deliberately and maliciously placed by Dawkins and Martin in the October 28, 2002, Notice, included Defendants' assertion that 1024 Euclid was subject to vermin infestation.  Dawkins and Martin knew that their statements of fact concerning rodent infestation related to Steinhauser's properties at 910 6th Street and 1024 Euclid were false and that the Code and Rules required "serious infestation" for a condemnation.

193.     When Defendants finally allowed Steinhauser access to his 1024 Euclid duplex to conduct his own inspection, Steinhauser and his rodent exterminator determined that there was no rodent infestation in the building and that there was no evidence that there had ever been any rodents in the building.  In fact, the exterminator noted that no rat droppings could be found.

194.     Another false entry deliberately and maliciously placed by Martin and Dawkins in the same Notice of Condemnation was their false assertion that the 1024 Euclid building was without heat.  This was falsely listed by Dawkins and Martin as constituting "material endangerment," in order to trigger the condemnation.

195.     Dawkins and Martin knew that their statements of fact concerning the lack of heat were false and they made these statements deliberately to maliciously damage Steinhauser.  In fact, the heat thermostat had simply been turned off by either the tenant or someone else and there was nothing wrong with the heating systems that served both units at 1024 Euclid, as was confirmed by a third party

48

contractor.

196.     As part of Defendants' discriminatory scheme to deprive Steinhauser of

his property and contract rights related to his rental properties, including the 1024 Euclid rental

property, Defendants Dawkins, Martin, Koehnen and others, including Dolan, did again prepare, serve,

file and mail a court Complaint and attachments, including the Notice of Condemnation described

above, along with Dawkins' sworn Verification certifying that Defendants assertions were true, when in

fact they were false.

197.     As part of said Defendants' illegal conduct and scheme, Defendants did attach to

those fraudulent court pleadings and Verification, false City inspection records regarding Steinhauser's

1024 Euclid property, as more fully set forth above, all for the discriminatory and deliberate purpose of

making malicious allegations that Steinhauser's property was dangerously deficient in safety and for the

malicious purpose to coerce and fraudulently induce Steinhauser into agreeing to a "code compliance"

on 1024 Euclid.

198.     As a direct result of said Defendants' discriminatory policy, custom and practice, and

wrongful conduct describe herein, Steinhauser has been forced to sell thirteen of his rental properties in

the City since 2002, and he presently owns two duplexes in the City.

199.     As a direct result of Defendants' discriminatory policy and conduct against

Steinhauser related to his 1024 Euclid rental property, as set forth herein, Steinhauser sustained loss of

rental income from two rental units at said property for an extended period of time, lost profits and

investments from condemnations, and forced sales, increased tax burdens, incurred substantial expenses

in unnecessary repairs, permit and code compliance fees, and other costs and expenses, including

alternative housing costs for Steinhauser's tenants that were forced from their homes, and court costs and attorney's fees.

<u>City of St. Paul Policy and Practice of Discriminatory Code Enforcement</u>

200.     Defendants' discriminatory code enforcement policy, custom and/or practice as set forth above, has existed in the City since at least March 2002, and continues in the City at the present time.

201.     As an example, City Council member Jay Benanav and Mayor Kelly were guest speakers at a St. Paul Association of Responsible Landlords meeting held on October 23, 2003. During this meeting with many St. Paul landlords, a question and answer period took place.  Council member Benanav, in response to a question from the audience, stated that when it comes to housing code enforcement, "I don't think any amount of aggressiveness is too aggressive."

202.     At this same meeting, a member of the audience asked Defendant Kelly, "Why are you coming into places when the tenant doesn't want you there and citing minor things and just condemning the buildings.  I don't think that is fair and what happens if I don't let you into my house?" In a loud and threatening voice, Defendant Mayor Kelly said, "You will comply."  During this statement, Defendant Kelly used very aggressive body language including pointing his finger at the landlord asking the question.

203.     Other examples exist of this continuing discriminatory policy, custom and/or practice in he City.  Mr. Bee Vue, who came to the United States from Laos in 1979, has lived in Minnesota since 1979.  In 1996, Vue entered the real estate investment business in St. Paul.  He and his wife currently own 24 rental properties in St. Paul and rent seventy (70) percent of their units to people

of color.   A member of the City's PPU, Attorney Dolan, informed Mr. Vue during a court proceeding

that, "Personally, I don't think you people deserve to be in this country." This statement made by Dolan

was overheard by other landlords.  Vue and others were shocked by this statement made by a member

of the City's PPU.

204.    Vues' rental properties have also been consistently targeted during 2002

through present by Defendants, while adjacent rental and other properties with serious problems, or

properties with the same conditions as Vues' buildings, are not targeted by Defendants for code

enforcement.

205.    Since 2002, Mr. Vue has also been lied to by a City fire department inspector

assigned to his rental properties, and consistently treated in a very condescending manner by the

inspector during his contacts with the inspector.  The inspector has told at least one other City inspector

to "just give Vue a condemnation notice" when the building had passed inspection and only needed

some minor repair.

206.    In early 2003, Vue and his wife, were subject to a lawsuit commenced against

them by Dawkins on behalf of Defendant City for code enforcement.  Vues' tenant had caused

sanitation problems in Vues' property for which Dawkins and his code enforcement officers wanted to

hold the Vues responsible.  After the suit was started, the Vues had a meeting with Dawkins at which

time they explained that the tenant was the cause of the sanitation problem.  Vues then asked Dawkins

to dismiss the lawsuit.  Dawkins stated that he and his department had quotas which required that the

City prosecute tenant remedy actions against landlords in the City in order to obtain foundation grant

money.   Thereafter, the Vue's were forced to agree to a full current code compliance on the subject

51

property.

207.     Kenneth Krahn, a St. Paul landlord, learned what it was like to be on the receiving

end of Defendants' aggressive code enforcement program.  Krahn has worked with Project Hope for

many years assisting less fortunate people to find permanent housing within the City.

208.     A City housing inspector informed Krahn in the Summer of 2002 that the City

wanted to review his tenant screening process to determine who he was renting to.  The inspector stated

that the City did not want him renting to people assisted by Project Hope, as they were "bottom of the

barrel" and not desirable.  "We don't want you renting to them," the inspector said, referring to Project

Hope clients.  These or similar statements were repeated again by the same inspector in the Summer of

2003.

209.     On or about June 13, 2003, Krahn learned that the City's code inspectors

had arrived at his rental duplex unit at 263 LaFond after a complaint from certain single family home

owners that rats were coming from his property.   Martin and Koehnen were involved in the inspection

of Krahn's duplex.  Krahn's tenants refused to make complaints against him as they had not been

having problems with rats.

210.     Upon Krahn's investigation, his apartment manager and Krahn learned that there

were rats all around the neighborhood and that the actual source of the rats was not Krahn's duplex but

rather the City's sewer system and that the rats had been coming out of the sewer that the City had

opened for repair just down the street from Krahn's duplex.

211.     Dawkins called Krahn and told him that Dawkins was thinking about taking

Krahn to court over the rat problem in Krahn's duplex.  Dawkins told Krahn that because of the rat

infestation, the building would be condemned and that Krahn would be responsible for putting all of his tenants into a hotel.  Dawkins then asked Krahn if he wanted to be present if the matter went to court.  Krahn replied, "Yes".  Dawkins asked Krahn if he wanted to go to court on the issue, to which Krahn replied, "No".  Dawkins then added, "As of right now, nothing is set, but I have to talk to the inspectors because they are the one's pushing for it to go to court."  Dawkins told Krahn that the law did not require the City to notify him of the City's court action against Krahn on the property, but that the law only required that the City attempt to notify the landlord.

212.    Following this phone conversation, Krahn contacted his attorney and informed him of the facts.  Krahn later determined that at the time he had talked to Dawkins, Dawkins had already scheduled a tenant remedies action hearing against Krahn in Court.

213.    The City subsequently dismissed the tenant's remedy action against Krahn.

214.     Krahn has stated that Community Stabilization Project ("CSP") worked together with the City inspectors and Dawkins in an effort to illegally condemn Krahn's duplex.  On the morning of the court hearing, CSP personnel came over to the duplex in four cars and attempted once again to convince Krahn's tenants to move out and join the City's court action against Krahn over the rats.  Krahn has stated that personnel from CSP were pushing the whole thing, telling the tenants that they could get Krahn to put them up in a hotel if they joined the case.

215.    Even though Krahn's tenants refused to bring court claims against Krahn, nevertheless Dawkins with the assistance of Attorney Dolan, named Krahn's tenants as party plaintiffs in the TRA filed in court.  The failure of the City and CSP to obtain the approval of Krahn's tenants to join the TRA lawsuit against Krahn is confirmed in a June 18, 2003, letter to the tenants from a private attorney

assisting CSP.  Krahn concluded from this letter that at no time did his tenants consent to be added to the City's malicious suit against him and yet the City and CSP added Krahn's tenants' names to the pleadings.

216.    Around the time of the action by the City and CSP against Krahn's duplex, CSP personnel went door to door on three other properties Krahn owned attempting to get Krahn's tenants in those apartments to go against him through court actions, promising tenants that CSP could get them lots of money from Krahn.  There were no complaints against these buildings at the time.

217.    In January 2004, St. Paul landlord, Steve Mark was ordered by a City housing inspector to remove one of the three Hispanic tenants from a rental unit that was identical in layout and square footage to a companion rental unit in the same building that housed three Caucasian tenants.  The City inspector's discriminatory order only applied to the Hispanics renting from Mr. Mark.

218.    City Code Enforcement Officer, Dick Lippert, under supervision of Dawkins and Kelly and working with other City Code officials and employees, also participated in furthering the discriminatory code enforcement action directed at members of the "protected class" by targeting Steve Johnson, another St. Paul landlord providing housing to those individuals.  About ninety (90) percent of Johnson's tenants are members of the protected class.   Johnson receives many tenant referrals from Project Hope.

219.    Commencing on January 30, 2003, and continuing to present, housing inspectors and officials, including Dawkins, Martin, Koehnen, Dick Lippert and Mike Kalis, and Attorney Dolan, have harassed Johnson on his rental properties in an effort to shut down Johnson's rental business. Said Defendants' illegal, discriminatory and malicious actions have forced Johnson to sell off many of his

rental properties that he was renting to members of the protected class.

220.    Even though Johnson's rental properties had no abnormal history of code violations during his ownership prior to 2003, commencing in early 2003, most of his rental properties in St. Paul were discriminationly targeted by said Defendants for code inspections.  Thereafter, Defendants repeatedly harassed Johnson by selectively enforcing the City housing code in a very strict and, most times, petty manner, while at the same time Defendants looked the other way on serious housing code violations at adjacent properties not owned by Johnson.

221.    On January 30, 2003, City Code Enforcement Officer, Mike Kalis, supervised by Dawkins, commenced the illegal harassment against Johnson by posting a "Vacant Building" sign on his occupied property located at 469 Whitall Street.  The property was in fact occupied by Johnson's son as his home.  Kalis ignored the obvious occupancy of the home.   Because of the Vacant Building posting and order prohibiting occupancy of the home, Johnson's son was forced to leave his home in the middle of winter.

222.    Following Johnsons' successful appeal of the illegal vacant building posting on 469 Whitall, on February 10, 2003, the City rescinded the "Vacant Building" status after the City's Nuisance Building Unit reinspected the home.  Within a few days, Martin retaliated against Johnson by conducting an exterior inspection of the Johnson home at 469 Whitall and thereafter issuing and mailing to Johnson and the occupant a Correction Notice dated February 10, 2003.  Martin informed Johnson that she would reinspect on February 24, 2003, and that the Code "deficiencies" must be corrected by that time or a criminal summons may be issued.

223.    Before the February 24, 2003, reinspection deadline, Martin made a second inspection of the Johnson home on February 19, 2003, and then prepared and mailed to Johnson and the occupant a Revised Correction Notice dated February 21, 2003, that noted additional "deficiencies" to be corrected by the original February 24, 2003, deadline.

224.    About one month later, Lippert and Dawkins prepared and mailed to Johnson and the occupant a "Notice of Condemnation As Unfit For Human Habitation And Order To Vacate" dated March 31, 2003, wherein they deliberately and maliciously condemned Johnson's 469 Whitall home for no valid reason.  Although the Notice was dated March 31, 2003, it ordered that Johnson's home was to be vacated by March 28, 2003, three days earlier.   Lippert and Dawkins also demanded a full code compliance before Johnson could reoccupy the home.

225.    The written Notice of Condemnation dated March 31, 2003, on Johnson's home, was based solely on three joists on the porch being slightly cracked.  Johnson already knew of this problem and he had previously discussed the repair with other City inspectors who informed him that it was a minor repair that only required "crutching" of the three slightly cracked joists.   Based solely upon this minor problem on the porch of the home, the condemnation and order to vacate the property issued by Lippert and Dawkins prohibited Johnson's son from re-occupying his home.

226.    Lippert, Dawkins, Martin and Koehnen, and other inspectors from Defendant City, continued to retaliate against Johnson by condemning another of his rental properties located in St. Paul that he had just purchased in December 2002.  This property was located at 941 Cypress.  Johnson leased the home to a tenant he received from Project Hope who was disabled, confined to a wheel-chair and receiving Social Security Disability Income assistance.

227.    In February 2003, Dawkins' Housing Department commenced harassment against Johnson's 941 Cypress property and its tenant by repeatedly citing the disabled tenant with Vehicle Abatement Orders and Summary Abatement Orders, and by issuing a criminal misdemeanor housing code citation to the tenant.

228.    Said Defendants were able to condemn Johnson's 941 Cypress rental property on March 13, 2003, after a questionable warrant and police "drug raid" into the disabled tenant's home. On information and belief, no charges were ever filed against the disabled tenant. Inspector Lippert and Dawkins promptly condemned Johnson's building at the end of the "drug raid" forcing the disabled tenant from his home.

229.    The raid at Johnson's 941 Cypress rental home for alleged drugs, the arrest of the disabled tenant, the subsequent failure to charge the tenant and the issuance of a condemnation of the home as a result of the raid, was similar to Brisson's experience in October 2003.

230.    As part of the condemnation of Johnson's 941 Cypress property, Lippert and Dawkins prepared and mailed to Johnson a Notice of Condemnation and Order to Vacate dated March 13, 2003. The sole basis for the condemnation of Johnson's 941 Cypress rental property was listed as "excessive storage of combustible materials "throughout" the home. Lippert and Dawkins falsely and maliciously stated the condition of the home. The tenant was simply repairing his snowblower in his kitchen. Instead of allowing the tenant to remove his snowblower and gas can from his kitchen, Lippert and Dawkins took the most drastic action in condemning the property and prohibiting anyone from living in the home. This illegal and malicious action by Dawkins and Lippert and the Housing Department caused injury to Johnson's tenant and to Johnson's rental business and

57

property.

231.    Martin prepared and mailed to Johnson a written Correction Notices on Johnson's

rental properties wherein she made malicious false statements about claimed code violations; many of

the entries in the written Correction Orders issued by Martin to Johnson were false and calculated to

make Johnson's properties look bad.

232.    For example, Johnson received in the mail from Inspector Martin a Correction Notice

dated January 16, 2004, regarding his rental property located at 606 Edmund Avenue, St. Paul, that

listed 12 items as being in violation of City code.  Five claimed code violations related to a toilet seat,

cabinets, carpet, roof and sanitation that were listed by Inspector Martin were deliberately false and

those conditions did not in fact exist.  These deliberately false allegations were malicious, in that Martin

and Koehnen had personally been present, witnessed and inspected this exact property at 606 Edmund

in June 2003, when Martin and Koehnen, with no prior notice, came to the property uninvited.  At that

time, Johnson was almost completed with an extensive renovation of the home which included the items

specifically listed by Martin and Koehnen, and more.  Martin and Koehnen personally toured the

premises, including the interior of the building, and expressed amazement of the quality of the materials

and workmanship and time and effort being expended by Johnson on renovation of the building.

233.    As a direct result of the constant discrimination treatment that Johnson received

from Dawkins, Martin and Koehnen, as well as from other inspectors from the City as identified above,

Johnson was thereafter forced to sell nineteen (19) of his rental properties totaling twenty four (24)

rental units in the City of St. Paul.   Of these nineteen (19) rental properties, sixteen (16) properties had

tenants who were members of the "protected class".  Said Defendants' discriminatory actions against

Johnson and his tenants continues at present.

234.    Martin and Dawkins also participated in similar discriminatory action directed at

St. Paul landlord Leroy Miller at his rental property located at 12 Oakley Avenue in the City in an

attempt to further their discriminatory attack on members of the "protected class" living within the City

of St. Paul and those landlords renting to them.

235.    On March 8, 2002, Miller purchased a duplex rental property located at Oakley

Avenue. This duplex was Miller's first rental property.

236.    On or about April 10, 2002, housing code enforcement inspectors

conducted an inspection of Miller's rental property and noted deficiencies in the state of repair of his

property including that the roof needed to be repaired.

237.    On May 21, 2002, a building permit was issued by the City for roof repair on

Miller's duplex.  The new roof was completed July 30, 2002 by American Building Contractors.

238.    During 2002 and most of 2003, the main floor rental unit was rented by Miller

to an Hispanic woman and the upstairs unit to two Caucasian college students.  The college student

renters left the upstairs unit at the end of August 2003.  Miller had an agreement with an African-

American male for rental of the upstairs unit to him after August 31, 2003.

239.    On or about May 16, 2003, Dawkins and an Assistant City Attorney prepared,

and subsequently filed, an action for the City in Ramsey County District Court against Miller's duplex;

this discriminatory lawsuit was against the prior owners of Miller's property, which included Muhannah

Kakish.

59

240.     As part of the City's court filings, Dawkins signed a sworn, verified Complaint

for relief wherein he claimed supervision of inspections and inspectors within the Department Housing.

The Complaint, Verification and City inspection records were mailed by Dawkins to Kakish and a prior

owner of the property.

241.     In Dawkins' Verification and the City's court papers, Dawkins made false

representations as to facts presented to the court and parties.  Dawkins falsely stated in Paragraph No.

5 that the violations listed in the City's April 10, 2002, written Correction Notice regarding the

property, "remained unabated as verified by an inspection done by Saint Paul Property Code

Enforcement".   Paragraph No. 3 stated that the "Main roof [was] in need of repair or replacement."

This sworn statement by Dawkins was completely false as the 12 Oakley roof had been completely

replaced under City permit on July 30, 2002, over nine months before Dawkins was preparing his

sworn statement to the court.

242.     The false claim by Dawkins that Miller's building needed roof repair was the

most serious claimed deficiency regarding Miller's building and a necessary component in order for

Dawkins to maliciously file his discriminatory court action against Miller's property.  Dawkins attached

to his verified Complaint a letter dated April 10, 2002, from his department listing the roof as needing

repair.  This letter was over one year old.

243.     Dawkins and his office served the Summons and Complaint with attachments

and Verification for the City's discriminatory court action against Kakish and Miller's 12 Oakley

property by mail to Kakish at 12 Oakley Avenue where Miller received it.  At that time, Kakish was

Miller's property manager.  After it was pointed out to the City Attorney that Kakish and the other

Defendant were no longer owners of the property, the City dismissed the court action on June 19, 2003.

244.    Thereafter, Martin claimed in a July 10, 2003, written Correction Notice sent through the mail to Miller addressed to his 1491 3rd Street East, St. Paul residence, that she inspected his 12 Oakley rental property on July 9, 2003 and made the following determination: "The roof is deteriorated, defective, or in a state of disrepair." Martin demanded that Miller, "Repair or replace the roof covering to a sound, tight and water impervious condition" and informed him that a "Permit may be required." The statement in the written Correction Notice by Martin that the roof was in disrepair was deliberately false as the roof had been completely replaced, and Martin's statement was maliciously made for the purpose of interfering with Miller's rental property business and his protected class tenants or potential tenants.

245.    Martin listed in the Correction Notice of July 10, 2003, additional claimed violations at Miller's 12 Oakley property that were deliberately false including false claims that refuse, garbage and junk were improperly stored by Miller or accumulated on his property and that vehicles were not properly licensed, operable or on an improved surface.

246.    Following Martin's July 9, 2003, inspection of Miller's property and issuance of her Correction Notice, Dawkins once again prepared a Verified Complaint against Miller's 12 Oakley rental property this time naming Miller as the correct owner and filed the court papers. Dawkins once again falsely swore under oath that the roof on Miller's building was in state of disrepair. During this court action, Attorney Dolan, a member of the PPU, represented the City against Miller. The Complaint, Verification and City inspection records were mailed by said Defendants and Dolan to

61

Miller.

247.     The Verified Complaint by Dawkins and Dolan in this second court action stated that an inspection of Miller's property had been conducted on July 9, 2003, and that multiple code violations were found.  The Verified Complaint once again deliberately, and maliciously, falsely stated that the roof was deteriorated.  The Complaint also falsely stated additional code violations: refuse and garbage were improperly stored or accumulated on his property; vehicles were not properly licensed, operable or were abandoned; lack of proper ground cover in the yard.  Dawkins provided a sworn Verification that the code violations listed in the Complaint had not been remedied.  This was once again a deliberately false statement and was made for the purpose of damaging Miller's interests in the property and to interfere with tenant rights.

248.     On or about August 13, 2003, Miller appeared in court with his property manager, Kakish.  During this court appearance, Kakish and Miller had conversations with Dolan and Martin.  Miller assured the court and Dolan and Martin that he was attempting to complete all necessary repairs and informed them that he needed to keep the building rented in order to have funds to make repairs.  In fact, Miller had made substantial investment into renovation of the property of which said Defendants had actual knowledge.

249.     During this court meeting, Dolan and Martin asked Miller to agree to allow the City to conduct a "code compliance" inspection of the 12 Oakley rental property.  Dolan and Martin assured Miller and Kakish that they wanted to continue to keep tenants in the rental property in order for repairs to be made.  Dolan and Martin also made mention of the short housing supply in the City and made assurances that Miller and Kakish would be able to continue to rent the rental property during

rehabilitation.

250.    Neither Miller nor Kakish had experience with code compliance inspections before and they did not know at that time that in order for a code compliance inspection to be conducted by LIEP, Miller's rental property would either have to be condemned or vacant.  At the time, Miller's property was not condemned or vacant.  Based upon the assurances of Dolan and Martin fraudulently made to coerce and induce Miller and Kakish to settle, Miller and Kakish agreed to the code compliance inspection.  Miller was ordered to reappear in court September 4, 2003.

251.    Kakish and Miller attempted to file for a code compliance inspection at the LIEP office but LIEP would not approve such an inspection without a condemnation or a vacant building.  On August 21, 2003, Miller obtained a building permit for remodel work at 12 Oakley that included the items listed by the City in its court action, including removal of the back porch, rebuilding the back stairs and moving the prefab stairs into place at the front door.

252.    On or about August 21, 2003, without Miller or Kakish's knowledge or consent, Martin gained entry to the inside of the 12 Oakley rental property and conducted an interior inspection of the upper and the lower units.  Martin made an illegal entry and search of the main floor apartment unit occupied by Miller's Hispanic tenant without the consent of Miller or the tenant and without an administrative warrant or existence of an emergency.

253.    After this illegal entry and search of Miller's building, Dawkins and Martin prepared and mailed to Miller and the occupants of the rental unit a written Notice of Condemnation and Order to Vacate dated August 25, 2003.  This discriminatory action by Dawkins and Martin shut down Miller's rental building and forced his Hispanic tenant from her home and prohibited Miller from

renting to the African-American tenant ready to occupy the upstairs rental unit.

254.     During a code compliance inspection that occurred after the condemnation,

City inspectors from the LIEP office stated to Miller that they did not feel that the conditions at Miller's

building warranted that the building be condemned by Martin.

255.     Because of the discriminatory condemnation and order to vacate, Miller lost

tenants and rental income to pay for maintenance and repairs, utilities, mortgage payments and other

expenses of the subject property, lost his investment in the home, and is now forced to sell his home.

COUNT I

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

18 U.S.C. SECTION 1961, et seq.

256.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 255 as set forth

above.

257.     At all relevant times, some or all of the following constituted a RICO

enterprise within the meaning of 18 U.S.C. S 1961(4), or an association in fact: the Division of Property

Code Enforcement; the Neighborhood Housing and Property Improvement Office; Citizen's Service

Office; Problem Property Unit; Problem Properties Task Force; the Mayor's Office; the St. Paul Police

Department; the St. Paul Fire Prevention Department; the Ramsey County Courts; and Community

Stabilization Project, within the meaning of 18 U.S.C. 1961(4) and 1962(c), in that it was a legal entity

or an association in fact.

258.     Defendants are individual "persons" within the meaning of 18 U.S.C. 1961(3) and

1962(c), who associated with, and/or participated in, the conduct of said enterprise's affairs.

64

259.    From at least October 08, 2002, and continuing at present, Kelly, Dawkins,

Martin, Magner, Koehnen, and John Doe and Jane Doe, in their individual capacity, as persons within

the meaning of 18 U.S.C. Section 1961(3), conducted and participated, directly and indirectly, in the

conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18

U.S.C. Section 1962 (c).

260.    Said Defendants pattern of racketeering activity consisted of:

a.      Said Defendants' extortion, or attempts, or conspiracy to do so, and/or threats of

physical violence, under color of official right, in interference with interstate commerce,

that was designed to extract direct or indirect personal rewards from Plaintiffs, if and

when Plaintiffs refused to turn over or succumb to Defendants' demands for illegal

Code compliance, control of the Plaintiffs' properties, weeding out of tenants that

Defendants decided were "undesirable" within the City of St. Paul, and that was

designed to reach coerced settlements that Defendants never intended to honor, to

interfere with the rights of Plaintiffs and their tenants to honest government services, to

force Plaintiffs to provide for emergency housing, to force Plaintiffs to admit the truth of

statements filed or prepared by Defendants which Defendants knew were false; said

racketeering activity interfered with the rights of Plaintiffs to honest government services,

and damaged Plaintiffs in their property or businesses; all or some of said acts were

done in violation of the "Hobbs Act," 18 U.S.C. 1951.

b.      Said Defendants' intimidation, threats, corrupt persuasion, or attempts to do so, or

misleading conduct toward Plaintiffs, with intent to influence, delay, or prevent testimony

65

of any person in an official proceeding, or to coerce or induce any person to withhold

testimony, from an official proceeding, or to hinder, delay or prevent Plaintiffs from

communication with a law enforcement officer or judge of the United States relating to

Defendants' commission of possible federal or state criminal offenses, and such acts

violated 18 U.S.C. 1512.

c.      Said Defendants' devised, or intended to devise, a scheme to defraud or for obtaining

money or property by means of false or fraudulent pretenses, representations, or

promises, beginning in or about March 2002, and continuing to the present, said

Defendants' misused the code inspection procedures, maliciously falsified facts which

the Defendants knew were not true, made false representations, promises, offers of

settlement, made fraudulent representations to the courts and to the citizens of St. Paul,

and to cover up and conceal the true duties of Defendants under the Federal HUD

grants and the City Code and state law.  For purposes of executing such fraudulent

schemes, Defendants placed or caused to be placed in a post office or authorized

depository for mail, matter that furthered the scheme(s).  Defendants committed mail

fraud in violation of 18 U.S.C. 1341 each time they used, or foreseeably caused, the

US mails to be used to distribute the materials described.

d.      Said Defendants beginning in or about March 2002, knowingly and fraudulently

devised, or intended to devise schemes or artifices to defraud or for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises, and

transmitted or caused to be transmitted by means of wire, radio or television

communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds, for the purpose of executing the schemes or artifices to defraud Plaintiffs. For purposes of executing such schemes, Defendants placed or caused to be placed, or did not correct, communications transmitted by the City web site, and other electronic communications, where such matter furthered the schemes. Said Defendants committed wire fraud in violation of 18 U.S.C. 1343 each time they used or foreseeably caused such wire transmissions or other electronic communications to be made or used to distribute the information described.

e.      Said Defendants, commencing in or about March 2002, knowingly executed, or attempted to execute a scheme or artiface to obtain money, funds, credits, assets, or other property under the custody or control of a financial institution by means of false or fraudulent pretenses, representations or promises in violation of 18 U.S.C. 1344.

f.      Said Defendants, commencing in or about March 2002, knowingly, intentionally, directly or indirectly, corruptly gave, offered, or promised, sought or obtained, to or from a "public official," something of value to act or refrain from acting, with the intent to influence or aid an official to commit or aid in the commission, collude, allow fraud or make opportunity for commission of fraud, on the United States, or accepted something of value personally for or because of any official act to be done or to be given as a witness in a hearing, trial or other such proceeding, including proceedings in Ramsey County, tenant remedy procedures, other landlord compliance proceedings, federal court proceedings, Federal Fair Housing Act proceedings, HUD grant application and

67

fund distribution proceedings, in violation of 18 U.S.C. 201.

g.     Said Defendants took, stole, tainted, alienated, transferred, concealed, or retained

without claim of right, property of Plaintiffs by artifice, swindle, trick, or other means

including promises to settle without any intent to perform, and the filing of false oaths

and statements, in violation of Minn. Stat. Ann. 609.901 et seq. (RICO), 609.05,

609.27, 609.2336, 609.52, applicable to RICO under *U.S. v. Nardello* 393 U.S. 286

(1969).

261.    These acts all occurred after the effective date of RICO and more than two such

acts occurred within ten years of one another.

262.    Defendants are individuals or other persons within the meaning of 18 U.S.C. 1961(3)

and 1962(c) who associated with, and/or participated in, the conduct of said enterprises affairs.

263.    On or about March 2002 through the present, Defendants conducted, participated in,

engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the "enterprise"

as alleged in paragraph no. 257 through a "pattern of racketeering activity," as listed in paragraph no.

260, within the meaning of 18 U.S.C. 1961(3), 1961(5) and 1962(c).  Defendants pattern of

racketeering activity consisted of acts as listed elsewhere in the Complaint.

264.    At all relevant times, the enterprises alleged in paragraph no. 257 were engaged in, and

their activities affected, interstate commerce and foreign commerce.

265.    All the predicate acts described in paragraph no. 260 above, were related so as to

establish a pattern of racketeering actvitiy, within the meaning of 18 U.S.C. 1962(c), in that their

common purpose was to misuse the Code enforcement process, fraudulently induce settlements never

intended to be honored, fraudulently increase the number of criminal rental property penalties, and carry

out such actions and other related actions under color of law or official right so as to damage landlords'

property and businesses and the property interests of Plaintiffs  tenants, and their common result was to

extort or obtain monies, property or damage the businesses of Plaintiffs and/or conceal the improper

motives of Defendants under the guise of protecting the exact same "protected class" tenants

Defendants had decided to remove from St. Paul; Kelly, Dawkins, Martin, Magner, Koehnen and John

Doe and Jane Doe, each personally, or through their agent or agents, directly or indirectly, participated

in all of the acts and employed the same or similar methods of commission, fraud, false oaths, extortion

and retaliation.  Steinhauser, Meysembourg and Brisson and other landlords were the victims of

racketeering and or the acts of racketeering were otherwise interrelated by distinguishing characteristics

and were not isolated events.

266.    All of the predicate acts described above were continuous so as to form a pattern of

racketeering activity in that:

       a.    Said Defendants engaged in the predicate acts described above over a

         substantial time (from at least March 2002, until present); and

       b.    Said Defendants continue, or threaten to continue, to engage in the predicate

         activity described above as regular way of conducting the enterprise and

         Defendants' ongoing governmental activities.

267.    As a direct and proximate result of, and by reason of, the activities of Defendants

and their conduct in violation of 18 U.S.C. 1964(c), Plaintiffs Steinhauser, Meysembourg and

Brisson and others have been injured in their persons, estates, business and/or property, within

the meaning of 18 U.S.C. 1964(c).  Each Plaintiff has sustained damages to business or property,

and such actions of Defendants in fraudulently conducting the Code enforcements, court

proceedings, and settlements caused Plaintiffs to incur legal and accounting costs and the costs of

investigation.

268.    Defendants' secret agreements were fraudulently concealed from Plaintiffs and the

courts as well as law enforcement.

269.    Defendants took specific acts and conspired to conceal their liabilities under their false

statements, fraudulent Code enforcement, false court and administrative filings, fraudulent settlements,

threats of criminal prosecution, and fraudulent compliance with other federal laws.

270.    These specific acts included racketeering and conspiracy and were of an ongoing nature

continuing into the future.

271.    Defendants each knowingly committed or conspired to commit, or agreed with the

commission of, at least one act described above in violation of RICO, or aided and abetted the

commission of one such act and thereby agreed with the objectives of the other Defendants.

272.    Plaintiffs are hereby entitled to recover from Kelly, Dawkins, Martin, Magner,

Koehnen, John Doe and Jane Doe, individually, jointly and severally, for threefold the damages

sustained, together with the costs of this suit, including reasonable attorney fees and expert fees.

273.    Plaintiffs also seek permanent injunctive relief to prohibit Defendants from

continuing their pattern of discriminatory code enforcement as described above.

70

COUNT II

CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT

ORGANIZATIONS ACT, 18 U.S.C. SECTION 1961, ET SEQ.

274.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 273 as set

forth above.

275.    From at least March 2002, and continuing on presently, Kelly, Dawkins, Martin,

Magner, Koehnen, and John Doe and Jane Doe, along with unknown third parties, have conspired to

conduct or participate, directly or indirectly, in the conduct of the "enterprise" described in paragraph

no. 257 through a "pattern of racketeering activity," as listed in paragraph no. 260, and elsewhere in the

Amended Complaint, in violation of 18 U.S.C. Section 1962 (d).

276.    Defendants Kelly, Dawkins, Martin, Magner, Koehnen, and John Doe and Jane Doe,

along with unknown third parties, agreed to commit one or more predicate acts in furtherance of the

scheme to defraud and/or agreed to the overall objective of the scheme to defraud Plaintiffs and other

landlords, all of whom were providing housing services to members of the "protected class."

277.    Each said Defendant committed, planned, conspired to commit, aided and abetted at

least one of the predicate acts, and/or conspired to commit, and/or aided and abetted the commission of

one or more predicate acts, and/or agreed to commit at least one predicate act, including threats of

criminal prosecution, and thereby committed at least one act in furtherance of the conspiracy in violation

of 18 U.S.C. 1962(d).

278.    As a direct and proximate result of, and by reason of, the activities of Defendants

Kelly, Dawkins, Martin, Magner, Koehnen, and John Doe and Jane Doe, along with unknown

71

third parties, as defined herein, Plaintiffs have been injured in their business or property, within

the meaning of 18 U.S.C. Section 1964 (c) and (d).

279.    Plaintiffs are hereby entitled to recover from Kelly, Dawkins, Martin, Magner,

Koehnen, John Doe and Jane Doe, individually, jointly and severally, for threefold the damages

sustained, together with the costs of this suit, including reasonable attorney fees and expert fees.

COUNT III

VIOLATION OF TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968 AND AMENDMENTS

(FEDERAL FAIR HOUSING ACT)

42 U.S.C. SECTIONS 3601 ET SEQ., 3613 AND 3617

280.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 279 as set

forth above.

281.    Commencing in March 2002, and continuing thereafter, Kelly, Dawkins, Martin,

Magner, Koehnen, John Doe and Jane Doe, and other members of the PPU, as well as members of the

Fire Department, intentionally and maliciously commenced and thereafter continued a discriminatory

policy, custom and pattern of code enforcement conduct that aggressively targeted Plaintiffs and other

St. Paul landlords, who were aiding, encouraging and associating with individuals with protected rights

to housing under Title VIII, Federal Fair Housing Act and Amendments, including African-Americans,

Hispanics, Asians, American-Indians, families with children, individuals with disabilities, those receiving

state and federal financial assistance, as well as others less fortunate, all ("protected class" members)

living within the City of St. Paul.

282.     Said Defendants discriminatory policy, custom and pattern of code enforcement conduct did coerce, intimidate, threaten and interfere with Plaintiffs on account of Plaintiffs having aided, associated with or encouraged their protected class tenants in exercise of these tenants' rights protected under Title VIII, 42 U.S.C. Section 3601 et seq.

283.     This discriminatory policy, custom and pattern of code enforcement conduct had the approval of the City Council.

284.     Defendants' discriminatory policy, custom and pattern of code enforcement conduct was intentional and malicious in Defendants' efforts to rid the City of St. Paul of "bottom of the barrel," "undesirable," "low income" individuals, who were in very large part, protected class members, and Plaintiffs and others who were assisting these individuals.

285.     Kelly, Dawkins, Martin, Magner, Koehnen, and other members of the PPU, as well as inspectors from the Fire Department, intended that their aggressive code enforcement operations would have a discriminatory impact upon members of the protected class.

286.     Said Defendants' further instituted a campaign of retaliation against Plaintiffs which impaired Plaintiffs' abilities to provide housing for low and moderate income tenants, members of the protected class.

287.     Said plan of retaliation resulted in actual damages to Plaintiffs' businesses and properties, including loss of income, profits and investments, physical disruption of rental and repair activities, false settlements, forced payments, forced sales of rental properties, unnecessary expenses and costs, attorney fees and other fees.

288.     Said Defendants have also allowed the City to retain and expend the $12 million in HUD grants, as well as other federal funds, while at the same time Defendants have concretely undermined the policy and purposes of that grant, by forcing tenants and landlords out of the St. Paul market for affordable, safe housing, in violation of federal and state law, including without due process and under color of law or official right.

289.     The Fair Housing Act relies upon private attorney generals to enforce its provisions, and Defendants cannot be expected to enforce the Act's provisions against themselves.

290.     Said Defendants' aggressive code enforcement operations had a discriminatory impact upon African-Americans, Hispanics, Asians, American-Indians, families with children, disabled individuals, those receiving state and federal financial assistance, and others less fortunate, all members of the "protected class." living within the City of St. Paul.

291.     Said Defendants knew that Plaintiffs had rental property leases with members of the "protected class" living within the City of St. Paul; and that Plaintiffs and their tenants had clearly established property interests in those leases; nevertheless, said Defendants intentionally, and unjustifiably retaliated against Plaintiffs to induce the breach of the leases by Defendants' discriminatory code enforcement conduct and as a direct result, said rental property leases were in fact breached, all resulting in damage to Plaintiffs and their protected class tenants.

292.     Defendants' discriminatory policy and pattern of retaliatory conduct continued at all times set forth herein and continues presently in the City.

293.     As a direct result of said Defendants' discriminatory policy and pattern of retaliatory conduct directed at Plaintiffs and others, Plaintiffs have sustained loss of rental income and damage to

74

their rental businesses, including lost profits and investments, have been forced to sell rental properties, and incurred other damages, included increased tax burdens, and have incurred unnecessary expenses and fees, and attorney and accounting fees and costs.

294.     Plaintiffs seek all their compensatory damages and punitive damages against Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

295.     Defendant City of Saint Paul is responsible for the discriminatory and/or retaliatory acts of Kelly, Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this time.

296.     Plaintiffs seek, pursuant to 42 U.S.C. Section 3613, permanent injunctive relief to prohibit Defendants from continuing their wrongful conduct, as Defendants' discriminatory code enforcement policy, custom and practice, as described above, has existed and continued and presently continues, within the City over an extended period of time.

COUNT IV

CIVIL RIGHTS VIOLATIONS

42 U.S.C. SECTION 1981

297.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 296 as set forth above.

298.     Kelly, Dawkins, Martin, Magner, Koehnen, John Doe and Jane Doe, and others unknown to Plaintiffs at this time, have intentionally denied Plaintiffs, on account of race, the same right to make and enforce contracts, and to have the full and equal benefit of all laws or proceedings for the security of persons and property as is enjoyed by white citizens, all in violation of the Civil Rights Act of

1866, 42 U.S.C. Section 1981.

299.     Defendants, with racially discriminatory intent, interfered with Plaintiffs'

contracts, and right to make and enforce contracts with non-white tenants, and with Plaintiffs' right to

enjoyment of all benefits, privileges, terms, and conditions of Plaintiffs' contractual relationships with

their non-white tenants.

300.     As a direct result of said Defendants' wrongful conduct, Plaintiffs have suffered

damages in the form of economic loss, including out-of-pocket losses, loss of profits and investments,

unnecessary expenses, fees and costs, and damages for deprivation of their civil and constitutional

rights.  Plaintiffs' also seek damages for anguish, emotional distress, humiliation and embarrassment, as

well as punitive damages and attorneys fees.

301.     Plaintiffs seek all their compensatory damages and punitive damages against Kelly,

Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

302.     Defendant City of Saint Paul is responsible for the discriminatory and/or

retaliatory acts of Kelly, Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this

time.

COUNT V

CIVIL RIGHTS VIOLATIONS

42 U.S.C. SECTION 1982

303.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 302 as set

forth above.

304.    Kelly, Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this time, have denied Plaintiffs, on account of race, the same rights as are guaranteed to white persons to purchase, lease, sell, hold and convey real and personal property, all in violation of the Civil Rights Act of 1866, 42 U.S.C. Section 1982.

305.    Defendants' discriminatory code enforcement policy, custom and practice, as more fully described above, impaired Plaintiffs' property rights and those of its tenants.

306.    As a direct result of said Defendants' wrongful conduct, Plaintiffs have suffered damages in the form of economic loss, including out-of-pocket losses, loss of profits and investments, unnecessary expenses, fees and costs and damages for deprivation of their civil and constitutional rights. Plaintiffs' also seek damages for anguish, emotional distress, humiliation and embarrassment, as well as punitive damages and attorneys fees.

307.    Plaintiffs seek all their compensatory damages and punitive damages against Kelly, Dawkins, Martin, Magner and Koehnen, and John Doe and Jane Doe, in their individual capacities.

308.    Defendant City of Saint Paul is responsible for the discriminatory and/or retaliatory acts of Kelly, Dawkins, Martin, Magner, Koehnen, and John Doe and Jane Doe.

309.    Plaintiffs also seek permanent injunctive relief to prohibit Defendants from continuing their pattern of discriminatory code enforcement as described above.

## COUNT VI

## CIVIL RIGHTS VIOLATIONS

## 42 U.S.C. SECTION 1983

310.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 309 as set

77

forth above.

311.    Kelly, Dawkins, Martin, Magner, Koehnen and other employees of Defendant

City of St. Paul, unknown to Plaintiffs at this time, all in their official capacities, did wrongfully deprive

Plaintiffs and their tenants of rights secured by the Constitution and laws of the United States, including

the right to be free from unreasonable searches and seizures under the Fourth Amendment, the right to

be free from taking of their property without compensation and the right to due process of law under the

Fifth Amendment, the right to equal protection of the laws under the Fourteenth Amendment, and the

right to pursue an occupation or profession free from governmental deprivation or undue interference

under the Fifth and Fourteenth Amendments, and rights established by 42 U.S.C. Sections 1981 and

1982.

312.    Kelly, Dawkins, Martin, Magner, Koehnen and other employees of City unknown

to Plaintiffs at this time, all in their official capacities, were following an unconstitutional City policy,

custom and practice of discriminatory code enforcement at the time of said deprivation of rights, all as

fully described above.

313.    The policy, custom and practice, described above, proximately caused the injury

to Plaintiffs.

314.    Defendant City is responsible for Plaintiffs' damages as a result of the policy,

custom and practice set forth herein.

315.    Kelly, Dawkins, Martin, Magner, Koehnen and other employees of  Defendant

City of St. Paul, unknown to Plaintiffs at this time, all in their individual capacities, acting under color of

state law, intentionally and maliciously subjected Plaintiffs in their occupations and/or professions to

deprivation of their rights and undue interference on account of Plaintiffs' tenants being protected class members.

316.    Said Defendants intentional and malicious conduct was a violation of Plaintiffs' rights secured by the Constitution and laws of the United States, including the right to be free from unreasonable searches and seizures, to be free from taking of property without compensation, the right to due process, the right to pursue an occupation or profession free from deprivation or undue interference, and the right to equal protection of the laws, under the Fourth, Fifth and Fourteenth Amendments, and rights established under 42 U.S.C. Sections 1981 and 1982.

317.    As a direct result of said Defendants' wrongful conduct, Plaintiffs have suffered damages in the form of economic loss and deprivation of their civil and constitutional rights.

318.    Plaintiffs seek all their compensatory damages and punitive damages against Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

319.    Defendant City of Saint Paul is responsible for the discriminatory and/or retaliatory acts of Defendants Kelly, Dawkins, Martin, Magner, Koehnen, John Doe and Jane Doe, and others unknown to Plaintiffs at this time.

## COUNT VII

## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

## IN VIOLATION OF 42 U.S.C. SECTION 1985

320.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 319 as set forth above.

79

321.     Kelly, Dawkins, Martin, Magner, Koehnen and other employees of Defendant

City of St. Paul, unknown to Plaintiffs at this time, conspired together with certain third parties, also

unknown to Plaintiffs at this time but who were not employees or agents of said City, to deny Plaintiffs

and their tenants their federal civil rights as set forth above.

322.     Said Defendants and their third-party conspirators conspired to deprive,

either directly or indirectly, Plaintiffs and their "protected class" tenants of their rights under the United

States Constitution, including their right to be free from unreasonable searches and seizures, their right to

compensation for taking of their property and to due process, right to pursue an occupation or

profession free from deprivation or undue interference and their rights to equal protection of the laws

under the Fourth, Fifth and Fourteenth Amendments, as well as their rights under 42 U.S.C. Section

1981, 42 U.S.C. Section 1982, and Title VIII, the Fair Housing Act of 1968 and the Fair Housing

Amendments Act of 1988, 42 U.S.C. Sections 3601, et seq.

323.     Said Defendants did act in furtherance of the conspiracy as more fully set out

above.

324.     Said conspiracy was motivated by racial and other class based, invidious

discriminatory animus behind the conspirators' action.

325.     As a direct result of said Defendants' wrongful conduct, Plaintiffs have suffered

damages in the form of economic loss, including out-of-pocket losses, and deprivation of their civil and

constitutional rights.  Plaintiffs' also seek damages for anguish, emotional distress, humiliation and

embarrassment, as well as punitive damages and attorneys fees.

326.     Plaintiffs seek all their compensatory damages and punitive damages against Kelly,

Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

STATE LAW BASED CLAIMS

COUNT VIII

ABUSE OF PROCESS

327.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 326 as set

forth above.

328.     At all times relevant herein, Plaintiffs were owners of rental properties located

within the City.

329.     Plaintiffs rented their properties to individuals protected under the constitution

and laws of Minnesota and the United States.

330.     Defendants, in a coordinated effort to rid the City of "bottom of the barrel,"

"undesirable" and "low income" individuals, targeted Plaintiffs' rental properties and tenants for

discriminatory, selective code enforcement.

331.     Defendants, as part of this illegal scheme, unlawfully and maliciously created

false entries in City code enforcement documentation, including in City Correction Orders, Notices of

Condemnations and Orders to Vacate, all as set forth above, in an effort to shut down the rental

businesses of Steinhauser, Mesyembourg and Brisson, increase their costs, force sale of rental

properties, increase their tax burdens force tenants from their homes and reduce the available housing

for those whom Defendants considered "bottom of the barrel," "undesirable" and "low income"

individuals.

332.     Defendants used the false entries in code documentation to maliciously condemn said Plaintiffs' rental properties and to order tenants and all other occupants to vacate their homes, all without adequate notice or opportunity for hearing.

333.     Additionally, Defendants, as part of the continuation of their illegal scheme, unlawfully and maliciously used the false code enforcement documentation in court filings against Steinhauser and Meysembourg, and against other St. Paul landlords as set forth above.

334.     Defendant City's court filings prepared by Dawkins, Martin, Koehnen and Magner, with assistance from other city employees and the City Attorney's office, against Steinhauser and Meysembourg, and other landlords as set for above, included reference to falsely stated code violations; Defendants attached the false City code documentation as attachments to the Court Complaints; Dawkins provided sworn Verifications as to truth of the false claims; said Defendants' malicious actions were made in an attempt to shut down the rental operations of Steinhauser and Meysembourg's and other St. Paul landlords, increase their costs, and thereby force out of the City the protected class individuals renting from said Plaintiffs and others in the City.

335.     As part of said Defendants' coordinated scheme, Defendants, and others, used these false entries in City records to condemn Steinhauser's and Meysembourg's properties and then presented this documentation to the Court in Emergency Tenant Remedies Actions, wherein Defendants falsely claimed in each case against Steinhauser and Meysembourg that there was an "emergency" justifying immediate court action, all based upon the false entries in City inspection records, all in an effort to shut down Plaintiffs' businesses and thereby put the protected class individuals out of their homes and hopefully out of the City of St. Paul.  Defendants' claim of an existing "emergency" justifying

82

immediate court action was maliciously made in order to further Defendants' efforts to force Plaintiffs

Steinhauser, Meysembourg and others out of business.

336.    In perpetrating the above wrongful acts, said Defendants acted maliciously and

wrongfully and with the intent, design, and purpose to specifically injure each Plaintiff and their tenants.

337.    Defendants' malicious and wrongful conduct directly caused severe damage to

each Plaintiff and to their tenants.  Defendants malicious and wrongful conduct condemned Plaintiffs'

rental properties, and thereby forced Plaintiffs' tenants from their homes and eliminated the source of

rental income to Plaintiffs.   Defendants wrongful conduct also directly caused a loss of profits and

investments to Plaintiffs, forced Plaintiffs to sell rental properties, and forced Plaintiffs to incur

unnecessary costs, fees and expenses, including attorneys fees, in attempting to protect their rights, and

to incur unnecessary expenses and fees in needless repairs demanded by Defendants.

338.    Plaintiffs seek all their compensatory damages against Kelly, Dawkins, Martin, Magner,

Koehnen and John Doe and Jane Doe, in their individual capacities.

339.    Defendant City of Saint Paul is responsible for the wrongful acts of Defendants Kelly,

Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this time.

COUNT IX

TORTIOUS INTERFERENCE WITH CONTRACT

340.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 339 as set

forth above.

341.    At all times relevant herein, there existed contracts between Plaintiffs and their

respective tenants for lease of private housing in the City of Saint Paul.

342.     Defendants had knowledge of Plaintiffs' leases with its tenants.

343.     Plaintiffs' leases on said rental properties included, but were not limited to, those individuals who were members of the protected class.

344.     Defendants intentionally procured breach of the contracts through illegal and malicious condemnations of Plaintiffs' rental properties and orders for tenants to vacate rental properties and through other intentional wrongful conduct, all as more fully described above.

345.     Defendants' intentional interference with Plaintiffs' contracts was without any justification.

346.     Plaintiffs have been directly damaged by Defendants' tortious interference with Plaintiffs' contracts, as Plaintiffs have lost rental and investment income, and have lost profits, incurred costs, fees and expenses in needless repairs and have incurred attorney's fees, other fees and court costs in defending against Defendants' malicious conduct.

347.     Plaintiffs seek all their compensatory damages against Defendants Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

348.     Defendant City of Saint Paul is responsible for the wrongful acts of Defendants Kelly, Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this time.

COUNT X

TORTIOUS INTERFERENCE WITH PLAINTIFFS'

BUSINESS EXPECTANCY

349.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through  348 as set forth above.

84

350.     At all times relevant to the allegations herein, Plaintiffs had rental businesses

located in the City of St. Paul.  Plaintiffs' primary tenants were "protected class" members.

351.     Plaintiffs had a reasonable expectancy of economic advantage or benefit from

their rental businesses and rental relationships with their tenants and prospective tenants.

352.     Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe engaged

in wrongful conduct, as more fully described above, that wrongfully interfered with Plaintiffs' reasonable

business expectation and which had an adverse effect on Plaintiffs' rental businesses.

353.     Said Defendants' wrongful interference was without justification, and was maliciously

intended to cause the destruction of, or harm to, Plaintiffs' rental relationships and reasonable business

expectation.

354.     Said Defendants' wrongful conduct was a proximate cause of the destruction of,

or harm to, Plaintiffs' rental businesses and business expectancy and the damages suffered by each

Plaintiff.

355.     Without Defendants' wrongful acts of interference, it is reasonable probable that

Plaintiffs would have realized the economic advantage or benefit as set forth herein.

356.     Plaintiffs suffered damage and losses as a direct result of Defendants' wrongful

interference with Plaintiffs' rental businesses; Plaintiffs have lost rental and investment income, and

profits, been forced to sell rental properties, had increased tax burdens, incurred costs, fees and

expenses in needless repairs, and have incurred attorney's fees and court costs in defending against

Defendants' wrongful conduct.

85

357.    Plaintiffs seek all their compensatory damages against Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Doe, in their individual capacities.

358.    Defendant City of Saint Paul is responsible for the wrongful acts of Defendants Kelly, Dawkins, Martin, Magner, Koehnen, and others unknown to Plaintiffs at this time.

WHEREFORE, Plaintiffs' demand judgment from the Court as follows:

1.    A judgment pursuant to Count I of this Complaint as set forth therein.

2.    A judgment pursuant to Count II of this Complaint as set forth therein.

3.    A judgment pursuant to Count III of this Complaint as set forth therein.

4.    A judgment pursuant to Count IV of this Complaint as set forth therein.

5.    A judgment pursuant to Count V of this Complaint as set forth therein.

6.    A judgment pursuant to Count VI of this Complaint as set forth herein.

7.    A judgment pursuant to Count VII of this Complaint as set forth herein.

8.    A judgment pursuant to Count VIII of this Complaint as set forth herein.

9.    A judgment pursuant to Count IX of this Complaint as set forth herein.

10.    A judgment pursuant to Count X of this Complaint as set forth herein.

11.    A judgment for Plaintiffs' compensatory damages to be proved at trial in this matter on all Counts herein.

12.    A judgment for Plaintiff's reasonable attorney's fees, costs and disbursements incurred, including in this proceeding as set forth in each count herein.

13.    A judgment for punitive damages against Defendants Kelly, Dawkins, Martin, Magner, Koehnen and John Doe and Jane Roe, in an amount as may be just and

equitable, as set forth in the applicable counts herein.

14.     A permanent injunction restraining Defendants from violating 42 U.S.C. Section

3601, et seq. and/or 42 U.S.C. Section 1982 and/or 18 U.S.C. Section 1961, et seq.

15.     For such other and further relief as the Court may deem proper and just in

the premises.

16.     For trial by jury on all issues so triable.

JOHN R. SHOEMAKER & ASSOCIATES


Dated: May 26, 2004                      By _____
                                         John R. Shoemaker (Attorney Lic. #161561)
                                         Centennial Lakes Office Park
                                         7701 France Avenue South, Suite 200
                                         Edina, Minnesota 55435
                                         (952) 841-6375
                                         Attorneys for Plaintiffs